678 A.2d 164

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT AND CROSS–RESPONDENT, v. RASHEED MUHAMMAD, DEFENDANT–RESPONDENT AND CROSS–APPELLANT.

Argued February 27, 1996—Decided June 28, 1996.

*John S. Redden,* Deputy First Assistant Prosecutor, argued the cause for appellant and cross-respondent (*Clifford J. Minor,* Es-

sex County Prosecutor, attorney; *Mr. Redden* and *Hilary Brunell*, Assistant Prosecutor, of counsel and on the briefs).

*Stephen W. Kirsch*, Assistant Deputy Public Defender, argued the cause for respondent and cross-appellant (*Susan L. Reisner*, Public Defender, attorney).

*Catherine A. Foddai*, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Deborah T. Poritz*, Attorney General, attorney).

*Marianne Espinosa Murphy*, argued the cause for amicus curiae New Jersey Coalition of Crime Victims (*Tompkins, McGuire & Wachenfeld*, attorneys).

*Boris Moczula*, First Assistant Passaic County Prosecutor, argued the cause for amicus curiae New Jersey County Prosecutors' Association (*Sharon B. Ransavage*, President, attorney).

*Jean D. Barrett* argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (*Crummy, Del Deo, Dolan, Griffinger & Vecchione* and *Ruhnke & Barrett*, attorneys; *Ms. Barrett, Lawrence S. Lustberg*, and *James E. Ryan*, on the brief).

*Richard D. Pompelio* submitted a brief on behalf of amicus curiae Pamela McClain.

The opinion of the Court was delivered by

GARIBALDI, J.

At issue in this appeal is whether the New Jersey victim impact statute, *N.J.S.A.* 2C:11–3c(6), is constitutional under the Federal and State Constitutions. We hold that the victim impact statute is constitutional under both Constitutions.

I

Defendant is charged with the kidnapping, rape, and murder of an eight-year-old child, Jakiyah McClain. On the afternoon of April 1, 1995, Jakiyah received permission from her mother to visit a friend, Ah–Tavia Maxey, who lived only a few blocks away.

Jakiyah arrived at her friend's apartment between 4:00 p.m. and 5:00 p.m. She asked Ah–Tavia's father if the two girls could play outside with one another. Mr. Maxey refused to give them permission and instead told them to go upstairs to the Maxey's apartment and ask Ah–Tavia's mother for permission.

While Jakiyah and Ah–Tavia were talking, defendant entered the apartment building. He volunteered to walk Jakiyah upstairs. He knew Jakiyah's mother. Ah–Tavia watched defendant take Jakiyah's hand and lead her upstairs. Ah–Tavia apparently remained on the ground floor. Shortly after, Ah–Tavia heard kicking, banging, and the sound of Jakiyah's screams.

When Jakiyah failed to return home that evening, her mother began to search for the child. After she was unable to locate Jakiyah, the mother at approximately 11:00 p.m. filed a missing person's report with the Newark Police Department. The next day, the police went to the apartment building where Jakiyah was last seen. They were told by the building superintendent that defendant had been given permission to stay in an abandoned apartment. When the police knocked on the door of the apartment, defendant answered and allowed them to enter. The police found Jakiyah's body, curled in a fetal position with her underpants around one ankle, under a pile of clothes in the bedroom closet. Ah–Tavia Maxey identified defendant as the man she saw the day before with Jakiyah.

Defendant was taken into custody. He gave a statement to the police in which he admitted to kidnapping, sexually assaulting, and murdering Jakiyah. An autopsy of the victim indicated that the cause of death was asphyxiation and that the victim was sexually assaulted.

On June 27, 1995, an Essex County Grand Jury indicted defendant for the capital murder of Jakiyah McClain, contrary to *N.J.S.A.* 2C:11–3a(1), (2). Defendant was also indicted on charges of first-degree kidnapping, contrary to *N.J.S.A.* 2C:13–1b(1); second-degree burglary, contrary to *N.J.S.A.* 2C:18–2; first-degree aggravated sexual assault of a child, contrary to *N.J.S.A.* 2C:14–

2a(1); and felony murder, contrary to *N.J.S.A.* 2C:11–3a(3). The State served notice of four aggravating factors: that the murder involved torture, aggravated assault or depravity of mind, *N.J.S.A.* 2C:11–3c(4)(c); that the murder was committed to escape detection or apprehension for another offense committed by defendant, *N.J.S.A.* 2C:11–3c(4)(f); that the murder was committed during the course of another felony, *N.J.S.A.* 2C:11–3c(4)(g); and that the victim was less than fourteen years old, *N.J.S.A.* 2C:11–3c(4)(k).

Defendant brought a pretrial motion, challenging the constitutionality of the victim impact statute under both the New Jersey and United States Constitutions. The trial court granted defendant's motion and declared the statute unconstitutional under both Constitutions. *State v. Muhammad,* No. 2285–6–95 (Law Div. Nov. 17, 1995). The trial court found the statute to be "irremediably defective" and held that it was "inconsistent with existing rules of evidence and procedure and the guarantees of due process under the [C]onstitutions of this State and of the United States." *Id.* slip op. at 1–2. The trial court, however, declined to reach the broader question of whether the New Jersey Constitution prohibits the use of victim impact evidence. The court did, however, reject defendant's argument that the application of victim impact statute to defendant would violate the *Ex Post Facto* Clauses of the State and Federal Constitutions. *Id.* slip op. at 16–17.

We granted the State's motion for direct certification pursuant to *Rule* 2:12–2, and also granted defendant's motion for leave to cross-appeal the trial court's *ex post facto* ruling.

## II

On June 19, 1995, Governor Whitman signed into law *L.*1995, *c.* 123; *N.J.S.A.* 2C:11–3c(6), commonly known as the victim impact statute. That law provides that:

When a defendant at a sentencing proceeding presents evidence of the defendant's character or record pursuant to subparagraph (h) of paragraph (5) of this subsection, the State may present evidence of the murder victim's character and background and of the impact of the murder on the victim's survivors. If the jury finds that the State has proven at least one aggravating factor beyond a reasonable

doubt and the jury finds the existence of a mitigating factor pursuant to subparagraph (h) of paragraph (5) of this subsection, the jury may consider the victim and survivor evidence presented by the State pursuant to this paragraph in determining the appropriate weight to give mitigating evidence presented pursuant to subparagraph (h) of paragraph (5) of this subsection.

[*N.J.S.A.* 2C:11–3c(6).]

The victim impact statute is merely one of the latest efforts by the Legislature to increase the participation of crime victims in the criminal justice system. In 1971, the Legislature enacted the Criminal Injuries Compensation Act of 1971, *N.J.S.A.* 52:4B–1 to – 33. In 1985, the Legislature enacted the Crime Victim's Bill of Rights, *N.J.S.A.* 52:4B–34 to –38, which granted crime victims and witnesses certain rights, including the right to be treated with dignity, the right to be informed about the criminal justice process, and the right to be told about available remedies and social services. The following year, the Legislature amended *N.J.S.A.* 2C:44–6 to allow family members of murder victims to include a written statement in the defendant's presentence report. In 1991, the Legislature amended the Crime Victim's Bill of Rights to provide victims with the opportunity to submit to a representative of the county prosecutor's office a written statement about the impact of the crime on the family and to allow victims to make in-person victim impact statements in non-capital cases directly to the sentencing court. *N.J.S.A.* 52:4B–36.

Finally, on November 5, 1991, the New Jersey electorate overwhelmingly approved Article I, paragraph 22 of the New Jersey Constitution, which is better known as the Victim's Rights Amendment.

The Victim's Rights Amendment provides:

A victim of a crime shall be treated with fairness, compassion and respect by the criminal justice system. A victim of a crime shall not be denied the right to be present at public judicial proceedings except when, prior to completing testimony as a witness, the victim is properly sequestered in accordance with law or the Rules Governing the Courts of the State of New Jersey. A victim of a crime shall be entitled to those rights and remedies as may be provided by the Legislature. For the purposes of this paragraph, "victim of a crime" means: a) a person who has suffered physical or psychological injury or has incurred loss of or damage to personal or real property as a result of a crime or an incident involving another

person operating a motor vehicle while under the influence of drugs or alcohol, and b) the spouse, parent, legal guardian, grandparent, child or sibling of the decedent in the case of a criminal homicide.

[*N.J. Const.* art. I, ¶ 22.]

The Victim's Rights Amendment explicitly authorizes the Legislature to provide victims with "those rights and remedies" that are deemed appropriate to effectuate the purpose of that amendment. On the basis of that constitutional authority, and relying on the United States Supreme Court's elimination of a federal constitutional bar against the admissibility of victim impact evidence in *Payne v. Tennessee*, 501 *U.S.* 808, 111 *S.Ct.* 2597, 115 *L.Ed.*2d 720 (1991), the New Jersey Legislature enacted the victim impact statute, *N.J.S.A.* 2C:11–3c(6).

The various victims' statutory rights enacted in this State are the product of a "victims' rights" movement that has swept through this nation over the last two decades. Historically, the legal system did not view crime victims as having any rights. Andrew J. Karmen, *Who's Against Victims' Rights? The Nature of the Opposition to Pro–Victim Initiatives in Criminal Justice*, 8 *St. John's J. Legal Comment.* 157 (1992). Because criminal attacks were viewed as attacks and threats on the entire community, and were prosecuted by the state on behalf of "the people," the actual victim was treated as merely another piece of evidence. *Ibid.* Although victims were expected to cooperate with authorities and to testify as part of the state's case-in-chief, little attention was paid to the financial, physical, and emotional needs of victims. David Roland, *Progress in the Victim Reform Movement: No Longer the "Forgotten Victim"*, 17 *Pepp.L.Rev.* 35, 36–38 (1989). Indeed, "[m]any commentators have observed that crime victims are largely excluded from the criminal justice system, and that those who are able to participate suffer a 'second victimization' at the hands of the system." Richard E. Wegryn, *New Jersey Constitutional Amendment for Victims' Rights: Symbolic Victory?*, 25 *Rutgers L.J.* 183, 184 (1993) (citations omitted). That feeling of isolation from the system causes many victims and their

families to "report widespread dissatisfaction with the criminal system." *Id.*

In response to the belief that the criminal justice system was tilted in favor of protecting the rights of defendants, while ignoring the plight of victims, crime victims joined together to address perceived injustices and imbalances in the criminal justice system and to work toward reforms. The victims' rights movement is comprised of many groups, each with their own agendas; however, all of the groups are devoted to increasing the role that victims play in the criminal process. Katie Long, Note, *Community Input at Sentencing: Victim's Right or Victim's Revenge?*, 75 *B.U.L.Rev.* 187, 189–91 (1995).

### III

Defendant asserts that the victim impact statute violates Article I, paragraph 12 of the New Jersey Constitution, which prohibits the infliction of cruel and unusual punishments, and the due process clause of the State Constitution.[1] In capital sentencing each juror must individually determine whether each mitigating factor exists, and then individually decide whether the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. *State v. Bey,* 112 *N.J.* 123, 161, 548 *A.*2d 887 (1988) (*Bey II* ), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995). The death penalty is imposed only if the jurors unanimously agree that the aggravating factors outweigh the mitigating factors. *Ibid.* One mitigating factor, *N.J.S.A.* 2C:11–3c(5)(h), (section 5(h)), is defined as "any other factor which is relevant to the defendant's character or record or to the circumstances of the offense." Essentially, section 5(h) is a catch-all factor of defendant's mitigating evidence not encompassed in the other defined

---

[1] Article 1, paragraph 1 of the New Jersey Constitution provides:

All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting private property, and of pursuing and obtaining safety and happiness.

factors. The victim impact statute provides that if the defendant presents evidence of his character or record pursuant to section 5(h), the State may present evidence of the murder victim's character and background and of the impact of the murder on the victim's survivors. That statute then directs the trial court to inform the jury that if the jury finds that the State has proven at least one aggravating factor beyond a reasonable doubt and the jury finds evidence of a mitigating catch-all factor, then the jury may consider the victim impact evidence presented by the State in determining the appropriate weight to give the catch-all factor.

Defendant alleges that the admission of victim impact statements in a capital case is likely to confuse and impassion the jury, and thus creates an impermissible risk that the penalty decision will be made in an arbitrary and capricious manner rather than on the basis of the relevant evidence. For the same reasons, defendant contends that victim impact evidence is inadmissible under *N.J.R.E.* 403, which requires that evidence be excluded if its probative value is substantially outweighed by the risk of undue prejudice, confusion of the issues, or misleading the jury.

The State contends that victim impact evidence is relevant to the sentencing decision because it illustrates each victim's uniqueness as a human being and the nature of the harm caused by the defendant's criminal conduct. In addition, the State maintains that deference should be given to the Legislature's judgment that victim impact evidence plays a proper role in capital sentencing. The State urges this Court to follow the United States Supreme Court's holding in *Payne* and similarly recognize that the State has a legitimate interest in presenting the sentencing authority with victim impact evidence. Further, the State argues that such a result is mandated by the Victim's Rights Amendment.

IV

█ The victim impact statute does not violate the United States Constitution. On July 27, 1991, the United States Supreme Court held that the Eighth Amendment of the Federal Constitu-

tion, which prohibits the imposition of cruel and unusual punishments, does not bar the admission of victim impact evidence during the penalty phase of a capital trial. *Payne, supra,* 501 *U.S.* at 811, 111 *S.Ct.* at 2601, 115 *L.Ed.*2d at 726. The Supreme Court overruled the prior holdings of *Booth v. Maryland,* 482 *U.S.* 496, 107 *S.Ct.* 2529, 96 *L.Ed.*2d 440 (1987), in which the Court held that the Eighth Amendment prohibits a capital sentencing jury from receiving victim impact evidence relating to the personal characteristics of the murder victim and the emotional impact of the death on the victim's family, and *South Carolina v. Gathers,* 490 *U.S.* 805, 109 *S.Ct.* 2207, 104 *L.Ed.*2d 876 (1989), in which the Supreme Court extended the rule adopted in *Booth* to statements made by the prosecutor about the personal qualities of the victim.

In reevaluating the exclusion of victim impact evidence, the Court rejected two of the premises underlying *Booth* and *Gathers:* first, that evidence of the personal characteristics of the victim and of the emotional impact of the crimes on the family does not in general reflect on the defendant's blameworthiness, and second, that only evidence of moral culpability is relevant to a capital sentencing decision. *Payne, supra,* 501 *U.S.* at 819, 111 *S.Ct.* at 2605, 115 *L.Ed.*2d at 731. The Court explained that the consideration of the harm caused by the crime has always been an important factor in determining the severity of a sentence. *Id.* at 820, 111 *S.Ct.* at 2605–06, 115 *L.Ed.*2d at 732. The majority in *Payne* noted that in excluding victim impact evidence, the *Booth* Court had misread the language of *Woodson v. North Carolina,* 428 *U.S.* 280, 304, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976), that the capital defendant must be treated as a "uniquely individual human bein[g]." *Payne, supra,* 501 *U.S.* at 818, 111 *S.Ct.* at 2604, 115 *L.Ed.*2d at 730. The *Payne* Court explained that "[t]he language quoted from *Woodson* in the *Booth* opinion was not intended to describe a class of evidence that *could not* be received, but a class of evidence which *must* be received." *Id.* at 822, 111 *S.Ct.* at 2607, 115 *L.Ed.*2d at 733.

The Court opined that the misreading of precedent in *Booth* had "unfairly weighted the scales in a capital trial" because it allowed the defendant to introduce virtually all mitigating evidence concerning his own circumstance, but barred the State from offering any victim impact evidence. *Ibid.* The Court recognized that the prosecution has a legitimate interest in using victim impact evidence to show each "victim's uniqueness as an individual human being." *Id.* at 823, 111 *S.Ct.* at 2607, 115 *L.Ed.*2d at 734. The *Payne* Court stated:

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." By turning the victim into a "faceless stranger at the penalty phase of a capital trial," *Booth* deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.
>
> [*Id.* at 825, 111 *S.Ct.* at 2608, 115 *L.Ed.*2d at 735 (citations omitted).]

The *Payne* Court thus held that if a "State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar." *Id.* at 827, 111 *S.Ct.* at 2609, 115 *L.Ed.*2d at 736. The majority opined that "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." *Id.* at 825, 111 *S.Ct.* at 2608, 115 *L.Ed.*2d at 735. *Payne* left undisturbed the holding in *Booth* that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment. *Id.* at 830 n. 2, 111 *S.Ct.* at 2611, n. 2, 115 *L.Ed.*2d at 739, n. 2.

We disagree with Justice Stein that the victim impact statute violates the Federal Constitution by impermissibly burdening a defendant's right to introduce catch-all mitigating evidence. *Post*

at 107, 678 *A.*2d at 206 (Stein, J., dissenting). Specifically, the argument is that defendants will likely forego their constitutional right to present catch-all mitigating evidence in order to avoid opening the door for the State to introduce victim impact evidence. The solution of both Justice O'Hern and Justice Stein is to permit victim impact evidence to be admitted and weighed against all the mitigating factors. We fail to understand, however, how "[p]ara-doxically, more victim impact evidence would pose less of a constitutional burden than that presented by the statute before us." *Post* at 60, 678 *A.*2d at 183 (O'Hern, J., concurring and dissenting).

Justice Stein relies on *Lockett v. Ohio,* 438 *U.S.* 586, 98 *S.Ct.* 2954, 57 *L.Ed.*2d 973 (1978) to support his theory. *Post* at 106, 678 *A.*2d at 205 (Stein, J., dissenting). That case is easily distinguishable. *Lockett, supra,* held that a defendant has a right to present any relevant mitigating evidence in support of a sentence less than death. *Id.* at 604, 98 *S.Ct.* at 2964–65, 57 *L.Ed.*2d at 990; *accord Penry v. Lynaugh,* 492 *U.S.* 302, 317–20, 109 *S.Ct.* 2934, 2946–48, 106 *L.Ed.*2d 256, 277–79 (1989); *Eddings v. Oklahoma,* 455 *U.S.* 104, 114, 102 *S.Ct.* 869, 876–77, 71 *L.Ed.*2d 1, 11 (1982). In *Lockett,* however, the trial court in accordance with a statute had prohibited the introduction of specific mitigating evidence. The victim impact statute does not prohibit the introduction of any mitigating evidence.

In the course of a criminal trial, defendants are constantly forced to make many hard choices. Whether they should testify or not is, perhaps, the most difficult choice. Yet no one would claim that the State's right to challenge the defendant's credibility or to introduce his prior record presents a constitutionally prohibited practice. Similarly, defendants are constantly forced to make difficult choices when they are determining what mitigating evidence to present. For example, if the defendant chooses to introduce mitigating evidence that relates to any of the other mitigating factors, *N.J.S.A.* 2C:11–3c(5)(a), (b), (c), (d), (e), (f), and (g), the State is allowed to present evidence that rebuts the

defendant's mitigating evidence. Likewise, if the defendant intro-
duces evidence under the catch-all mitigating factor, the State is
permitted to introduce evidence to remind the jury that the
defendant did not kill an abstract victim, but a real, unique human
being whose loss is felt by the victim's survivors. Such evidence
goes to a defendant's moral blameworthiness. The defendant is
no more restricted from introducing evidence relevant to the
catch-all factor than he would in introducing evidence relevant to
any other mitigating factor.

■ While we may have drafted the victim impact statute
differently, the judiciary does not have a license "to rewrite
language enacted by the [L]egislature." *Chapman v. United
States,* 500 *U.S.* 453, 464, 111 *S.Ct.* 1919, 1927, 114 *L.Ed.*2d 524,
538 (1991) (quoting *United States v. Monsanto,* 491 *U.S.* 600, 611,
109 *S.Ct.* 2657, 2664, 105 *L.Ed.*2d 512, 524 (1989)). The victim
impact statute as written is constitutional under both the Federal
and State Constitutions. Accordingly, this Court has no "license"
to rewrite that statute.

## V

■ At times we have interpreted the State Constitution to
afford New Jersey citizens broader protection of certain rights
than that afforded by analogous or identical provisions of the
Federal Constitution. *See, e.g., State v. Pierce,* 136 *N.J.* 184, 208–
13, 642 *A.*2d 947 (1994); *State v. Novembrino,* 105 *N.J.* 95, 145,
519 *A.*2d 820 (1987); *State v. Gilmore,* 103 *N.J.* 508, 522–23, 511
*A.*2d 1150 (1986); *State v. Hunt,* 91 *N.J.* 338, 344, 450 *A.*2d 952
(1982). With respect to capital punishment in particular, we have
held that "our State Constitution 'provides an additional and,
where appropriate, more expansive source of protections against
the arbitrary and nonindividualized imposition of the death penal-
ty.' " *State v. Koedatich,* 112 *N.J.* 225, 251, 548 *A.*2d 939 (1988)
(quoting *State v. Ramseur,* 106 *N.J.* 123, 190, 524 *A.*2d 188 (1987),
*cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989)).
Although we have at times pursued an independent course in

capital punishment jurisprudence, "it is not enough to say that because we disagree with a majority opinion of the Supreme Court, we should invoke our State Constitution to achieve a contrary result." *State v. Hempele,* 120 *N.J.* 182, 226, 576 *A.*2d 793 (1990) (O'Hern, J., dissenting). Furthermore, whenever a challenge is raised to the constitutionality of a statute, there is a strong presumption that the statute is constitutional. "[C]ourts do not act as a super-legislature." *Newark Superior Officers Ass'n v. City of Newark,* 98 *N.J.* 212, 222, 486 *A.*2d 305 (1985). Thus, any act of the Legislature will not be ruled void unless its repugnancy to the Constitution is clear beyond a reasonable doubt. "Where alternative interpretations of a statute are equally plausible, the view sustaining the statute's constitutionality is favored." *Town of Secaucus v. Hudson County Bd. of Taxation,* 133 *N.J.* 482, 492, 628 *A.*2d 288 (1993), *cert. denied,* 510 *U.S.* 1110, 114 *S.Ct.* 1050, 127 *L.Ed.*2d 372 (1994).

In *Hunt, supra,* 91 *N.J.* at 364–67, 450 *A.*2d 952 (Handler, J., concurring), Justice Handler set forth criteria for determining whether the State Constitution provides a basis for a result different than that permitted by the Federal Constitution. In assessing the constitutionality of a statute under the New Jersey Constitution, the following seven factors should be examined: (1) textual language, (2) legislative history, (3) preexisting State law, (4) structural differences between the Federal and State Constitutions, (5) matters of particular State interest, (6) State traditions, and (7) public attitudes.

Applying the *Hunt* criteria to the victim impact statute, we conclude that the New Jersey Constitution does not prohibit family members from testifying about the character of the murder victim or the impact of the crime on the family during the penalty phase of a capital case. With respect to factors one and four, textual language and structural differences, there is a substantial difference in the two Constitutions. In the New Jersey Constitution there is a specific provision, namely, the Victim's Rights Amendment, that recognizes the rights of victims. A similar

clause does not exist in the United States Constitution. Our State Constitution explicitly provides victims of crimes with more rights than the Federal Constitution. The Victim's Rights Amendment expressly authorizes the Legislature to provide crime victims with "those rights and remedies" as it determines are necessary. Even if we were inclined to diverge from the holding in *Payne* and interpret the Cruel and Unusual Punishment Clause of our State Constitution as providing greater protections against the arbitrary imposition of the death penalty, the text of the New Jersey Constitution demands that we not pursue such an independent course. The authority to enact the victim impact statute can be traced directly to Article I, paragraph 22 of the New Jersey Constitution. In upholding the constitutionality of the victim impact statute, we are mindful of the words of Justice (then Judge) Pashman in *New Jersey Sports & Exposition Auth. v. McCrane*, 119 *N.J.Super.* 457, 476–77, 292 *A.*2d 580 (Law Div. 1971), *aff'd as modified*, 61 *N.J.* 1, 292 *A.*2d 545, *appeal dismissed*, 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.*2d 215 (1972), "It must be remembered that the greatest danger to people from the exercise of the judicial power is that there may be a usurpation by the courts of the people's right to express in law, by overwhelming numbers of their elected legislators, their collective reasoning."

An examination of factors two, five, six, and seven, offers further proof that the New Jersey Constitution, like the Federal Constitution, supports the right of victims to present victim impact evidence at the sentencing phase of a capital trial. When the Legislature enacted *N.J.S.A.* 2C:11–3c(6), it expressly explained in a statement accompanying the bill that the statute is designed "to effectuate Art. I, para. 22 [of the New Jersey Constitution] to the fullest extent permissible under the [F]ederal [C]onstitution, and to implement the will of the New Jersey electorate with regard to capital prosecution." Senate Judiciary Committee, *Statement to Senate Bill No. 1728*, at 1 (March 20, 1995). Unlike most interpretations of constitutional provisions, we need not surmise what the founders intended when they drafted the Victim's Rights Amendment. We know exactly what the founders of this constitu-

tional amendment intended—fair treatment for victims. To hold the victim impact statute unconstitutional would require us to ignore the Victim's Rights Amendment and the will of the electorate that overwhelmingly approved the constitutional amendment. Over 1,200,000 citizens voted for the Victim's Rights Amendment while only 223,248 people voted against it. *Manual of New Jersey, Two Hundred and Fourth Legislature* (First Session) 1992, at 903. Beginning with the passage of the Criminal Injuries Compensation Act of 1971 (*N.J.S.A.* 52:4B-1 to -33), the people of New Jersey, speaking through the Legislature, have repeatedly expressed a very strong "public attitude" that victims should be provided with more rights.

Nor does an examination of preexisting State law, factor two, provide authority for us to reach a different result. Although in the past we have suggested that victim impact statements are inadmissible at the sentencing phase of a capital murder trial, *see, e.g., State v. Pennington,* 119 *N.J.* 547, 566–71, 575 *A.*2d 816 (1990); *State v. Williams,* 113 *N.J.* 393, 450–54, 550 *A.*2d 1172 (1988), those opinions never addressed victim impact evidence in light of a post-*Payne* statute that specifically authorizes the introduction of victim impact statements. Our decisions rendered prior to *Payne* were not based on an independent foundation in the New Jersey Constitution, but rather were based on the United States Supreme Court's view in *Booth* and *Gathers* that the introduction of victim impact evidence in the sentencing phase of a capital case violated the Eighth Amendment of the Federal Constitution. *See, e.g., Pennington, supra,* 119 *N.J.* at 566–71, 575 *A.*2d 816; *Williams, supra,* 113 *N.J.* at 450–54, 550 *A.*2d 1172.

After *Payne* and prior to the enactment of the victim impact statute, we continued to hold that victim impact evidence should be excluded from capital cases. In the absence of any legislative action to the contrary, this approach was consistent with Justice O'Connor's concurrence in *Payne, supra,* in which she wrote, "We do not hold today that victim impact evidence must be admitted, or even that it should be admitted. We hold merely that if a State

decides to permit consideration of this evidence, 'the Eighth Amendment erects no per se bar.'" 501 *U.S.* at 831, 111 *S.Ct.* at 2612, 115 *L.Ed.*2d at 739–40 (citations omitted) (O'Connor, J., concurring). In the absence of the Victim's Rights Amendment, we might have continued to hold that victim impact evidence should not be admitted during the sentencing phase of a capital case. However, the electorate, by passing the Victim's Rights Amendment, which is intended to afford victims whatever rights could be afforded to them without violating the United States Constitution, and the Legislature, by enacting *N.J.S.A.* 2C:11–3c(6) in order to effectuate that amendment, have mandated that victim impact evidence be admitted. *Cf. State v. Harris,* 141 *N.J.* 525, 548, 662 *A.*2d 333 (1995) (acknowledging that constitutional amendment overruled holding in *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988)).

■ We must now harmonize the victim's constitutional rights with the defendant's due process rights under the State Constitution. *Supra* at 35, fn. 1, 678 *A.*2d at 170, fn. 1. We agree with Justice Handler that "different sections of the Constitution should be read in harmony not in conflict." *Post* at 75–76, 678 *A.*2d at 190–191 (Handler, J., dissenting). We well-recognize that competing clauses of a constitution should be harmonized to give effect to competing clauses. We part company with Justice Handler, however, because of his failure to recognize that the substantial limitations we have placed on the admission of victim impact evidence effectively harmonizes the victim's constitutional right to have victim impact evidence introduced with the defendant's due process rights. *See infra* at 53–56, 678 *A.*2d at 179–180.

## VI

We have always recognized that it is almost impossible to avoid referring to some victim impact evidence in a capital murder trial. In fact, much of the victim impact evidence that is likely to be admitted during the penalty phase would have been presented

anyway during the guilt phase of the trial. Where, however, the victim impact evidence presented had no bearing on the substantive issue of guilt or the penalty to be imposed, we previously did not allow the State to present such evidence due to our concerns over the potential inflammatory effect of victim impact evidence. *See, e.g., State v. Coyle*, 119 *N.J.* 194, 231–32, 574 *A.*2d 951 (1990) (holding that victim impact evidence "serve[s] only to prejudice the jury unduly against the defendant and to confuse its deliberations on the aggravating factors"); *Williams, supra*, 113 *N.J.* at 452, 550 *A.*2d 1172 ("inflammatory statements [about the victim's character] could likely result not only in unduly prejudicing the jury against defendant but also in confusing it over whether its deliberations should be influenced by the sterling character of the victim"). These concerns still exist. Nevertheless, we recognize that under the Victim's Rights Amendment and the victim impact statute the electorate and the Legislature have determined that before a jury determines whether to sentence a defendant to death, the jurors should, in limited circumstances, be informed about the uniqueness of the victim as a human being and the particular harm caused by the crime.

In holding that in limited situations the State can offer the jury a quick glimpse of the victim's life and the impact of the loss on the victim's surviving family members, we do not believe that the jury is likely to become overwhelmed and confused by victim impact evidence. In *State v. Zola*, 112 *N.J.* 384, 431–32, 548 *A.*2d 1022 (1988), *cert. denied*, 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989), we recognized the right of a capital defendant to make a brief statement in mitigation to the jury at the close of the presentation of evidence in the penalty phase without exposing himself to cross-examination. We observed that a brief statement by the defendant would be unlikely to "inject a fatal emotionalism into the jury's deliberations." *Id.* at 431, 548 *A.*2d 1022. We believe that a similar brief statement from the victim's family about how the killing has impacted their lives is also unlikely to inflame the jury. "[J]ustice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till

it is narrowed to a filament. We are to keep the balance true." *Snyder v. Massachusetts,* 291 *U.S.* 97, 122, 54 *S.Ct.* 330, 338, 78 *L.Ed.* 674, 687 (1934).

Defendant asserts that, to the extent that a victim impact statement presents evidence about conditions that the defendant was unaware when he committed the criminal act, such as the victim's occupation and marital status, the statement is irrelevant and impermissibly diverts the jury from making its sentencing decision on the character of the defendant and the circumstances of the crime. However, "criminal conduct has traditionally been categorized and penalized differently according to the consequences not specifically intended, but determined in part by conditions unknown to a defendant when he acted." *Payne, supra,* 501 *U.S.* at 835–36, 111 *S.Ct.* at 2614, 115 *L.Ed.*2d at 742 (Souter, J., concurring). While it is clear that a defendant's foreknowledge of the specific consequences that his acts are likely to have is relevant to sentencing, the foreseeable consequences of a defendant's actions are equally relevant. "Murder has foreseeable consequences. When it happens, it is always to distinct individuals, and, after it happens, other victims are left behind." *Id.* at 838, 111 *S.Ct.* at 2615, 115 *L.Ed.*2d at 744. Defendants who intentionally choose to kill know that their actions will destroy a unique individual who is likely to be a parent, child, spouse, brother, or sister.

While a defendant might be unaware of the specific characteristics of his victim or of the particular survivors that the victim will leave behind, it is completely foreseeable that the killing will eliminate a unique person and destroy a web of familial relationships. "That foreseeability of the killing's consequences imbues them with direct moral relevance, ... and evidence of the specific harm caused when a homicidal risk is realized is nothing more than evidence of the risk that the defendant originally chose to run despite the kinds of consequences that were obviously foreseeable." *Id.* at 838–39, 111 *S.Ct.* at 2616, 115 *L.Ed.*2d at 744 (citations omitted). That conclusion is buttressed by the facts of

this case. When the killer brutally attacked eight-year-old Jaki-yah, it was completely foreseeable that the homicidal behavior would eliminate a uniquely individual human being and cause great harm to the survivors of the little girl. Although the killer might have been ignorant of the details about Jakiyah and her family, it does not violate the Constitution if the jury is permitted to take into account such obviously foreseeable consequences.

## VII

Although victim impact evidence when offered to rebut a defendant's presentation of catch-all mitigation evidence is not prohibited by the New Jersey Constitution, it must nevertheless be relevant and reliable. The admission of evidence relating to the victim's character or the impact of the murder on the victim's family requires a balancing of the probative value of the proffered evidence against the risk that its admission may pose the danger of undue prejudice or confusion to the jury. *N.J.R.E.* 403; *Williams, supra,* 113 *N.J.* at 451, 550 *A.*2d 1172. "[I]n each case there is a traditional guard against the inflammatory risk, in the trial judge's authority and responsibility to control the proceedings consistently with due process, on which grounds defendants may object." *Payne, supra,* 501 *U.S.* at 836, 111 *S.Ct.* at 2614, 115 *L.Ed.*2d at 743 (Souter, J., concurring). Ultimately, whether specific victim impact evidence is too prejudicial is a factor that should be evaluated in each case within the exercise of the trial court's discretion.

Although the decision to admit specific victim impact statements will typically be in the discretion of the trial court, certain statements are clearly impermissible. For example, the State will not be permitted to elicit testimony concerning the victim's family members' characterizations and opinions about the defendant, the crime, or the appropriate sentence. Similarly, statements that are grossly inflammatory, unduly prejudicial, or extremely likely to divert the jury from its focus on the aggravating and mitigating factors should be excluded. *Williams, supra,*

113 *N.J.* at 452, 550 *A.*2d 1172. Allowing such testimony could render a defendant's trial fundamentally unfair and could lead to the arbitrary imposition of the death penalty. Victim impact evidence admitted pursuant to *N.J.S.A.* 2C:11–3c(6) should be limited to statements designed to show the impact of the crime on the victim's family and to statements that demonstrate that the victim was not a faceless stranger, but was a unique individual human being. There is no place in a capital case for unduly inflammatory commentary. *Ibid.*

Although we are not bound by the law of other states, we observe that the vast majority of jurisdictions that have considered the admissibility of victim impact evidence have similarly concluded that such evidence is relevant to determining the appropriate sentence. *See State v. Gonzales,* 181 *Ariz.* 502, 892 *P.*2d 838, 852 (1995) (holding that trial court may consider victim impact evidence to rebut evidence defendant offers in mitigation), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 720, 133 *L.Ed.*2d 673 (1996); *Nooner v. State,* 322 *Ark.* 87, 907 *S.W.*2d 677, 689 (1995), *cert. denied* —— *U.S.* ——, 116 *S.Ct.* 1436, 134 *L.Ed.*2d 558 (1996); *People v. Edwards,* 54 *Cal.*3d 787, 1 *Cal.Rptr.*2d 696, 819 *P.*2d 436, 467 (1991) (finding that victim impact evidence relates to aggravating factor of circumstances of offense), *cert. denied,* 506 *U.S.* 841, 113 *S.Ct.* 125, 121 *L.Ed.*2d 80 (1992); *In re Petition of the State of Delaware,* 597 *A.*2d 1, 3 (Del.1991) (holding that capital punishment statute requires trial court to consider merits of admitting victim impact evidence during penalty phase of a first-degree murder trial); *Windom v. State,* 656 *So.*2d 432, 438 (Fla.) (ruling that victim impact evidence is admissible only after State has presented evidence of aggravating circumstances; evidence limited to demonstrating victim's uniqueness as human being and resultant loss to community members by victim's death), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 571, 133 *L.Ed.*2d 495 (1995); *Livingston v. State,* 264 *Ga.* 402, 444 *S.E.*2d 748, 751 (1994) (holding that victim impact evidence may be relevant to defendant's culpability); *State v. Card,* 121 *Idaho* 425, 825 *P.*2d 1081, 1088 (1991) (same), *cert. denied,* 506 *U.S.* 915, 113 *S.Ct.* 321, 121

*L.Ed.*2d 241 (1992); *People v. Hope,* 147 *Ill.*2d 315, 168 *Ill.Dec.* 103, 107, 589 *N.E.*2d 503, 507 (1992) (finding that victim impact evidence helps jury assess defendant's moral culpability; also consistent with Illinois Crime Victim's Bill of Rights); *State v. Scales,* 655 *So.*2d 1326, 1336 (La.) (finding victim impact evidence that is not overly detailed is admissible), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 716, 133 *L.Ed.*2d 670 (1995); *Evans v. State,* 333 *Md.* 660, 637 *A.*2d 117, 129 (holding that victim impact evidence did not deny defendant due process), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 109, 130 *L.Ed.*2d 56 (1994); *State v. Parker,* 886 *S.W.*2d 908, 927 (Mo.1994) (same), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 1827, 131 *L.Ed.*2d 748 (1995); *McNelton v. State,* 111 *Nev.* 900, 900 *P.*2d 934, 937–38 (1995), *cert. denied* —— *U.S.* ——, 116 *S.Ct.* 1833, —— *L.Ed.*2d —— (1996); *State v. Fautenberry,* 72 *Ohio St.*3d 435, 650 *N.E.*2d 878, 882–83 (holding that victim impact evidence is relevant to circumstances of offense and impact on survivors), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 534, 133 *L.Ed.*2d 439 (1995); *Freeman v. State,* 876 *P.*2d 283, 289 (Okla.Cr.App.) (holding victim impact evidence is relevant consideration of capital sentencing juries), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 590, 130 *L.Ed.*2d 503 (1994); *Lucas v. Evatt,* 308 *S.C.* 31, 416 *S.E.*2d 646, 649 (1992) (finding victim impact evidence is no different from other relevant evidence); *State v. Smith,* 857 *S.W.*2d 1, 14 (Tenn.) (same), *cert. denied,* 510 *U.S.* 996, 114 *S.Ct.* 561, 126 *L.Ed.*2d 461 (1993); *Banda v. State,* 890 *S.W.*2d 42, 63 (Tex.Cr.App.1994) (holding capital sentencing jury is permitted to hear victim impact evidence), *cert. denied* —— *U.S.* ——, 115 *S.Ct.* 2253, 132 *L.Ed.*2d 260 (1995); *Weeks v. Commonwealth,* 248 *Va.* 460, 450 *S.E.*2d 379, 389 (1994) (finding that victim impact evidence is relevant to aggravating factor), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 100, 133 *L.Ed.*2d 55 (1995); *State v. Gentry,* 125 *Wash.*2d 570, 888 *P.*2d 1105, 1134–41 (holding that victim impact evidence is relevant to sentencing), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 131, 133 *L.Ed.*2d 79 (1995). Only a few states have banned the introduction of victim impact evidence. *See, e.g., Bivins v. State,* 642 *N.E.*2d 928 (Ind.1994), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 783, 133 *L.Ed.*2d

734 (1996); *Mack v. State*, 650 *So.*2d 1289, 1324–25 (Miss.1994), *cert. denied*, —— *U.S.* ——, 116 *S.Ct.* 214, 133 *L.Ed.*2d 146 (1995); *State v. Guzek*, 322 *Or.* 245, 906 *P.*2d 272 (1995). When *N.J.S.A.* 2C:11–3c(6) is considered in conjunction with the Victim's Rights Amendment, it is obvious that the electorate of New Jersey wants this State to align itself with the weight of authority that has recognized the relevance of victim impact evidence.

## VIII

Even if victim impact evidence were relevant, defendant contends that the trial court was correct in holding that the limitations placed on the admission of such evidence by *N.J.S.A.* 2C:11–3c(6) renders the statute invalid. The trial court observed that the victim impact statute is written in terms of the jury as a whole finding the existence of the catch-all mitigating factor and, if it does so, being permitted as a body to consider what weight the mitigating factor should receive in light of the victim impact evidence. *Muhammad, supra,* slip op. at 3. That statutory scheme, according to the trial court, is inconsistent with our requirement in *Bey II, supra,* 112 *N.J.* at 161, 548 *A.*2d 887, that each juror in capital cases individually decide whether a mitigating factor is present and what weight it should receive. *Id.* Envisioning a divided jury on the catch-all mitigating factor, the trial court concluded that the victim impact statute might impermissibly allow before the entire jury evidence that only some of the jurors (*i.e.,* those jurors that found the existence of the catch-all mitigating factor) are allowed to consider. *Id.* slip op. at 4. Because jurors who did not find the existence of the mitigating factor would be exposed to victim impact evidence, that for them would be irrelevant under *N.J.S.A.* 2C:11–3c(6), the court held that the statute was "irremediably defective." *Id.* slip op. at 1. The court declared that the *N.J.S.A.* 2C:11–3c(6) "require[s] a level of mental gymnastics beyond the ability of any juror," and therefore its enforcement would violate principles of due process. *Id.* slip op. at 12–13.

 Although under the victim impact statute there is the possibility that some jurors who do not find the existence of the catch-all mitigating factor will be exposed to victim impact evidence, this situation is not unusual in capital cases. As a matter of federal constitutional law, each juror must individually determine the existence of mitigating factors and then individually decide whether the aggravating factors outweigh the mitigating ones. *Bey II, supra,* 112 *N.J.* at 161, 548 *A.*2d 887. Thus, whenever a defendant presents mitigation evidence that the State is allowed to rebut using otherwise inadmissible evidence, there is the possibility that jurors who did not find the existence of that mitigating factor will nevertheless be exposed to the rebuttal evidence. For example, if a defendant introduces evidence of good character, the State is entitled to introduce evidence of bad character that would otherwise be inadmissible. Jurors who did not find the "good character" mitigating factor would nevertheless be exposed to the State's rebuttal evidence. That situation is analogous to the situation under *N.J.S.A.* 2C:11-3c(6).

 Defendant also contends that jurors will be unable to follow the court's instructions about using victim impact evidence only for the limited purpose of determining how much weight should be accorded to the catch-all factor, and instead will misuse victim impact evidence to support aggravating factors or even use it to justify a death sentence. Justice Handler also asserts that it will be impossible for trial courts to give clear jury instructions under the victim impact statute. *Post* at 70, 678 *A.*2d at 188 (Handler, J., dissenting). We acknowledge that jury instructions regarding the victim impact statute will be more complex than most jury instructions in non-capital cases, and therefore have requested the Trial Judges Committee on Capital Causes to draft appropriate instructions that are consistent with this opinion. However, jury instructions in all capital cases are more complex than those given in non-capital cases. The instructions that will be given regarding evidence admitted under the victim impact statute will be similar to those already given in capital cases. The

victim impact instructions just present a further refinement of the type of refined judgments we expect jurors to make in capital cases.

 We have long relied upon the ability of jurors to faithfully follow a trial judge's instructions in deliberating on a defendant's guilt, and, in the capital context, the appropriate sentence. *See State v. Manley,* 54 *N.J.* 259, 270, 255 *A.*2d 193 (1969) ("[I]n administering the criminal law, the courts must rely upon the jurors' ability and willingness to follow the limiting instruction[s] without cavil or question."); *accord State v. Obstein,* 52 *N.J.* 516, 527 n. 1, 247 *A.*2d 5 (1968); *State v. Cormier,* 46 *N.J.* 494, 508, 218 *A.*2d 138 (1966). While there is no way to assure that a jury adheres scrupulously to the mandate of a limiting instruction, there is no reason to believe that jurors will not act responsibly in performing their duty. The entire structure of the penalty phase of capital cases is premised on the belief that jurors will use evidence only for its proper purpose. For example, under current law, jurors must be unanimous in finding the existence of an aggravating factor. Thus, even if eleven jurors find that the evidence supports an aggravating factor, they are not permitted to consider that factor if the twelfth juror made no such finding. Nevertheless, we trust that those eleven jurors will adhere to the trial court's limiting instruction and deliberate about the appropriate sentence without consideration of those aggravating factors that they found to exist beyond a reasonable doubt. Although limiting instructions cannot eliminate the possibility that jurors will misuse victim impact evidence, that concern "does not justify a prophylactic, constitutionally based rule that this evidence may never be admitted." *Payne, supra,* 501 *U.S.* at 831, 111 *S.Ct.* at 2612, 115 *L.Ed.*2d at 739 (O'Connor, J., concurring).

## IX

The Legislature has taken appropriate steps to reduce the possibility that jurors will misuse victim impact evidence. Under the victim impact statute, the admission of victim impact evidence

is limited to a clearly delineated course. Only if the jury finds that the State has proven at least one aggravating factor beyond a reasonable doubt *and* the jury finds the existence of a mitigating factor pursuant to *N.J.S.A.* 2C:11–3c(5)(h) may the jury consider victim impact evidence. Even if these requirements are met, the victim impact statements can be used solely for the purpose of determining how much weight to attach to the catch-all mitigating factor. Victim impact testimony may not be used as a general aggravating factor or as a means of weighing the worth of the defendant against the worth of the victim. "[O]ur law does not regard a crime committed against a particularly virtuous person as more heinous than one committed against a victim whose moral qualities are perhaps less noteworthy or apparent." *Williams, supra,* 113 *N.J.* at 450, 550 *A.*2d 1172. The victim impact statute mandates that such evidence can be introduced for only one purpose, namely, to assist the jury in determining the appropriate weight to give the catch-all mitigating factor.

While legislatures in other states have enacted statutes that allow victim impact evidence to be admitted for any purpose, *see, e.g., Ark.Code Ann.* § 5–4–602(4) (Michie 1993); *Ill.Rev.Stat.* ch. 38, para. 1406 (1989), the New Jersey Legislature was very careful not to allow victim impact evidence to be used as a general aggravating factor. It is apparent that the Legislature in drafting *N.J.S.A.* 2C:11–3c(6) was cognizant of our previous opinions in which we opined that "[i]t is constitutionally required that juries in capital trials reach a verdict and impose a penalty without inordinate exposure to unduly prejudicial, inflammatory commentary." *Williams, supra,* 113 *N.J.* at 453, 550 *A.*2d 1172.

Various safeguards are included in the victim impact statute to ensure that victim impact evidence will not be admitted in a manner that would allow the arbitrary and unconstitutional imposition of the death penalty. For example, the victim impact statute does not confer upon the victim's family an absolute right to testify during the penalty phase. "[R]ather, the prosecutor is to determine what evidence, if any, should be submitted" to the

jury. Senate Judiciary Committee, *Statement to Senate Bill No. 1728*, at 1 (March 20, 1995).

 To harmonize the victim impact statute with the due process clauses of the Federal and State Constitutions, the Attorney General and County Prosecutors Association have both urged us to devise additional procedural safeguards to reduce the possibility that victim impact evidence is admitted for improper purposes or is used inappropriately. As a matter of fairness, we hold that certain additional procedures must be followed before victim impact statements can be entered into evidence. The defendant should be notified prior to the commencement of the penalty phase that the State plans to introduce victim impact evidence if the defendant asserts the catch-all factor. The State shall also provide the defendant with the names of the victim impact witnesses that it plans to call so that defense counsel will have an opportunity to interview the witnesses prior to their testimony. The greater the number of survivors who are permitted to present victim impact evidence, the greater the potential for the victim impact evidence to unduly prejudice the jury against the defendant. Thus, absent special circumstances, we expect that the victim impact testimony of one survivor will be adequate to provide the jury with a glimpse of each victim's uniqueness as a human being and to help the jurors make an informed assessment of the defendant's moral culpability and blameworthiness. Further, minors should not be permitted to present victim impact evidence except under circumstances where there are no suitable adult survivors and thus the child is the closest living relative.

 Before a family member is allowed to make a victim impact statement, the trial court should ordinarily conduct a *Rule* 104 (formerly *Rule* 8) hearing, outside the presence of the jury, to make a preliminary determination as to the admissibility of the State's proffered victim impact evidence. The witness's testimony should be reduced to writing to enable the trial court to review the proposed statement to avoid any prejudicial content. The testimony can provide a general factual profile of the victim, including

information about the victim's family, employment, education, and interests. The testimony can describe generally the impact of the victim's death on his or her immediate family. The testimony should be factual, not emotional, and should be free of inflammatory comments or references.

The trial court should weigh each specific point of the proffered testimony to ensure that its probative value is not substantially outweighed by the risk of undue prejudice or misleading the jury. *N.J.R.E.* 403. Determining the relevance of the proffered testimony is particularly important because of the potential for prejudice and improper influence that is inherent in the presentation of victim impact evidence. However, in making that determination, there is a strong presumption that victim impact evidence that demonstrates that the victim was a unique human being is admissible. During the preliminary hearing, the trial court should inform the victim's family that the court will not allow a witness to testify if the person is unable to control his or her emotions. That concern should be alleviated by our requirement that the witness be permitted only to read his or her previously approved testimony. Finally, the court should also take the opportunity to remind the victim's family that the court will not permit any testimony concerning the victim's family members' characterizations and opinions about the defendant, the crime, or the appropriate sentence. Finally, the trial court should inform the prosecutor that any comments about victim impact evidence in his or her summation should be strictly limited to the previously approved testimony of the witness.

The limitations that we have placed on the admission of victim impact evidence are not designed to restrict any of the rights afforded to victims by either the Victim's Rights Amendment or the victim impact statute. Rather, these controls are necessary to minimize the possibility that victim impact statements made during the penalty phase of a capital trial will inflame the jury and prevent it from deciding the proper punishment on the basis of relevant evidence.

Even though we hold that the introduction of victim impact statements during the sentencing phase of a capital case does not violate the New Jersey Constitution, we recognize that under certain circumstances victim impact statements could render a defendant's sentencing fundamentally unfair and could lead to the arbitrary imposition of the death penalty. This was also a concern of the *Payne* Court, which warned that "[i]n the event that [victim impact] evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Supra*, 501 *U.S.* at 825, 111 *S.Ct.* at 2608, 115 *L.Ed.*2d at 735. We have confidence in the ability of the courts to determine whether a defendant has been impermissibly prejudiced by the admission of unduly inflammatory victim impact evidence.

X

Defendant also contends that applying *N.J.S.A.* 2C:11–3c(6) to him would violate the State and federal constitutional prohibitions on *ex post facto* laws because his alleged crimes were committed on April 1, 1995, and *N.J.S.A.* 2C:11–3c(6) did not go into effect until June 19, 1995. *See U.S. Const.* art. I, § 10, cl. 1; *N.J. Const.* art. IV, § 7, ¶ 3. The purpose of the *Ex Post Facto* Clauses is to guarantee that criminal statutes "give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham*, 450 *U.S.* 24, 28–29, 101 *S.Ct.* 960, 964, 67 *L.Ed.*2d 17, 23 (1981). In order to violate the *Ex Post Facto* Clauses, the statute in question must either (1) punish as a crime an act previously committed, which was innocent when done; (2) make more burdensome the punishment for a crime, after its commission; or (3) deprive a defendant of any defense available according to the law at the time when the crime was committed. *Beazell v. Ohio*, 269 *U.S.* 167, 169–70, 46 *S.Ct.* 68, 68–69, 70 *L.Ed.* 216, 217 (1925). *See also Doe v. Poritz*, 142 *N.J.* 1, 42–43 n. 10, 662 *A.*2d 367 (1995) (holding that there is no reason why our interpretation of the State's *Ex Post Facto* Clause should

not follow the United States Supreme Court's interpretation of the Federal Clause).

The victim impact statute does not violate any of the above proscriptions. It does not criminalize behavior that was previously lawful. Nor does *N.J.S.A.* 2C:11-3c(6) make more burdensome the punishment for a crime after its commission. Defendant argues, however, that applying the victim impact statute to his case would materially alter the situation to his disadvantage because the presentation of victim impact evidence might lessen the weight that the jury attaches to the catch-all mitigating factor. Although defendant's assessment may be correct, the fact that a statute works to a defendant's disadvantage does not constitute an *ex post facto* violation. *Collins v. Youngblood,* 497 *U.S.* 37, 50, 110 *S.Ct.* 2715, 2723, 111 *L.Ed.*2d 30, 44 (1990). Because *N.J.S.A.* 2C:11-3c(6) simply modified the scope of evidence that may be admitted during the penalty phase of a capital case and did not alter any substantive rights of defendant, the statute's application to defendant would not violate the State or Federal *Ex Post Facto* Clauses. *Accord Nooner v. State, supra,* 907 *S.W.*2d at 689; *Windom v. State, supra,* 656 *So.*2d at 439; *State v. Maxwell,* 647 *So.*2d 871, 872 (Fla.Dist.Ct.App.1994), *aff'd,* 657 *So.*2d 1157 (Fla. 1995); *Livingston v. State, supra,* 444 *S.E.*2d at 752; *cf. State v. Erazo,* 126 *N.J.* 112, 135, 594 *A.*2d 232 (1991) (holding that application of *N.J.S.A.* 2C:11-3c(2)(f), which permits State to introduce evidence about aggravating factor of prior murder, did not violate *Ex Post Facto* Clauses when applied to defendant whose crime occurred before statute was enacted). The victim impact statute applies to all trials and retrials commenced after June 19, 1995, regardless of the date of the murder.

## XI

We also disagree with Justice Handler's speculations that the introduction of victim impact evidence will "destroy proportionality review" and should not be tolerated "because of its powerful and corrosive potential for invidious discrimination." *Post* at 70–71,

678 *A.*2d at 188–189 (Handler, J., dissenting). We observe that much victim impact evidence is already admitted into evidence in the guilt phase. Such evidence, therefore, is presently considered in proportionality review. Undoubtedly, the presence of victim impact evidence admitted under the victim impact statute will make proportionality review a more complicated process, just as a defendant's use of an allocution statement creates a more complicated review system. However, we do not hold that allocution statements even if they create a more complex review procedure are not to be considered in a proportionality review analysis. Nor should we hold that victim impact evidence should not be considered in proportionality review.

Justice Handler's comments with regard to racial discrimination are equally speculative. This Court has never held that the Death Penalty Act is unconstitutional because it discriminates against defendants on the basis of race. As we recognized in *State v. Marshall,* 130 *N.J.* 109, 613 *A.*2d 1059 (1992) (*Marshall II* ), a court can only see that justice is rendered at a given time. That admonition is equally applicable to Justice Handler's comments about the effect of victim impact evidence on both proportionality review and discrimination.

## XII

After *Payne* it is clear that there is no per se federal constitutional bar to the admission of victim impact evidence. The mandate of the people of this State, as expressed through the adoption of the Victim's Rights Amendment and the enactment of the victim impact statue, is to give crime victims and their families the right to present victim impact evidence during the penalty phase of a capital murder trial. We are bound to give effect to the will of the electorate absent a constitutional prohibition, and we hereby do so.

We reverse the trial court's order that *N.J.S.A.* 2C:11–3c(6) is unconstitutional. Therefore, in accordance with this opinion, the

State may introduce victim impact evidence at the penalty phase of defendant's trial.

WILENTZ, C.J., concurring.

I join in the opinion and result reached by the Court today. I write only to express my misgivings on the resolution, both nationally and within this state, of the admissibility of victim impact evidence in the sentencing phase of capital trials.

A judge's agreement or disagreement with the opinions of the United States Supreme Court, or with the amendments to the State Constitution approved by the people, and the legislation that follows, are almost always irrelevant: the judge is obligated, regardless of his or her personal views, to obey the law. My agreement with *Booth v. Maryland,* 482 *U.S.* 496, 107 *S.Ct.* 2529, 96 *L.Ed.*2d 440 (1987), however, and disagreement with *Payne v. Tennessee,* 501 *U.S.* 808, 111 *S.Ct.* 2597, 115 *L.Ed.*2d 720 (1991), both run deep, as does my disagreement with the constitutional amendment approved by the voters in New Jersey in 1991 (*N.J. Const.* art. I, ¶ 22) and the law, the victim impact statute, that was adopted thereafter. *L.* 1995, *c.* 123; *N.J.S.A.* 2C:11–3c(6). While the actions of the United States Supreme Court left each state free to accept or reject victim impact evidence, I find the conclusion inescapable that New Jersey voters, by approving the amendment to our Constitution, intended to allow the Legislature to adopt the victim impact statute. I realize that *Payne* was decided after the Legislature approved the constitutional amendment, but before the voters acted on it. The timing cuts both ways, but as far as I am concerned the spirit and intent of that constitutional amendment was clear: the voters intended to authorize any and all aid or support for victims of crime and their families that was not prohibited by the United States Constitution. Certainly victim impact evidence in the sentencing phase of capital trials fits within that class. I believe it would be clearly inconsistent with sound constitutional interpretation to hold otherwise.

Today's opinion does no more than accord to our constitutional amendment and the victim impact law their most obviously intended consequence, namely, to allow the State to introduce, in opposition to evidence of the defendant's good character and the mitigating circumstances of the offense, the damage done by taking the life of the victim, damage both to the victim and to his or her family. *Payne, supra,* 501 *U.S.* at 824–25, 830 n. 2, 111 *S.Ct.* at 2608, 2611 n. 2, 115 *L.Ed.*2d at 735, 739 n. 2. For all of the reasons expressed in the majority opinion in *Booth* and the dissenting opinion in *Payne,* I disagree. Although my disagreement is irrelevant, I feel compelled to express it. Victim impact evidence has no place in a rationally conducted sentencing proceeding. It is a throwback, at least potentially, to the days when the death penalty could be imposed arbitrarily, without reason, much like being struck by lightning.

O'HERN, J., concurring and dissenting.

Paradoxically, more victim impact evidence would pose less of a constitutional burden than that presented by the statute before us. Not more victim impact evidence in the cumulative sense in each case but more in the sense that the use of such evidence should not be limited to cases in which a defendant has pled the catch-all mitigating factor of *N.J.S.A.* 2C:11–3c(5)(h) as qualified by the method of implementation set forth in *Laws* 1995, *chapter* 123, *N.J.S.A.* 2C:11–3c(6). I reach this conclusion without meaning any criticism of the well-intended sponsors of the law. The Legislature was acting out of an excess of caution. However, the procedure for introducing victim impact evidence that it has selected imposes an impermissible burden on the right of a defendant to introduce logically relevant evidence. The price is that the jury will be instructed to consider a proposition that is instinctive to the human experience but illogical in law—that the worth of the victims' lives affects the weight to be given to the mitigating circumstances in the defendant's life.

I have no doubt that the constitutional amendment, article I, paragraph 22 of the New Jersey Constitution, should be read to permit the Legislature to effectuate to the fullest extent permissible under the Federal Constitution a reasonable respect for the rights of crime victims. *Payne v. Tennessee*, 501 *U.S.* 808, 111 *S.Ct.* 2597, 115 *L.Ed.*2d 720 (1991), establishes, as a matter of federal constitutional law, that in capital cases

> [t]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society in particular to his family.
>
> [*Id.* at 825, 111 *S.Ct.* at 2608, 115 *L.Ed.*2d at 735 (quoting *Booth v. Maryland*, 482 *U.S.* 496, 517, 107 *S.Ct.* 2529, 2540, 96 *L.Ed.*2d 440, 457 (1987) (citations omitted) (White, J., dissenting)).]

In our capital cases we have concluded that even when not required by constitutional compulsion, our common sense of humanity would not permit a jury to sentence a person to death without ever hearing his or her voice spoken in a courtroom. *State v. Zola*, 112 *N.J.* 384, 548 *A.2d* 1022 (1988), *cert. denied*, 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989). I believe that we may say with equal conviction that a jury should never consider a sentence of death without having known who has died. In almost every capital case that we have considered, our juries have had an understanding of the unique human personalities of the victims and their families. We need consider but a few of those cases. In *State v. Marshall*, 123 *N.J.* 1, 586 *A.2d* 85 (1991), the defendant's innocent wife as victim and their two trusting children were all too well known to the jury. In *State v. Harris*, 141 *N.J.* 525, 662 *A.2d* 333 (1995), the jury knew that Harris had inflicted lethal torture, not only on the murder victim but on the other members of the victim's family. In *State v. Clausell*, 121 *N.J.* 298, 580 *A.2d* 221 (1990), witnesses described the victim's role as a high school basketball coach and his relationship with his child. In *State v. Pennington*, 119 *N.J.* 547, 575 *A.2d* 816 (1990), there was testimony concerning the lives of the victim, Arlene Connors, her husband, Frank, and their children.

"We recognize that it is impossible to avoid referring to the victim in a capital trial." *Id.* at 570, 575 *A.*2d 816. What we have stressed is that "the prosecution may not comment on the evidence in a manner that serves only to highlight the victim's virtues in order to inflame the jury." *Ibid.* (quoting *State v. Williams,* 113 *N.J.* 393, 451–52, 550 *A.*2d 1172 (1988)).

Under our system of capital punishment, the jury "forms the essential link between society and the defendant before the court. Each capital jury expresses the collective voice of society in making the individualized determination that a defendant shall live or die." *Zola, supra,* 112 *N.J.* at 429, 548 *A.*2d 1022. In the course of that decision, which allowed defendants to make unsworn pleas for mercy to the jury at the penalty phase, we said "we need not discard our common humanity in the process of decision." *Id.* at 431, 548 *A.*2d 1022. I therefore agree with those who argue that in view of our common humanity, the collective voice of society can best be pronounced when in fair measure the murder victim's identity is preserved and considered in the capital decisionmaking process. That is only human.

At the same time, we must always avoid an appeal for a verdict based on the worthier life. Our society is dedicated to the preservation of human life. We treasure every life, whether that of victim or of defendant. Hence, I would hold that the triggering and response mechanisms in the statute are invalid in that they unconstitutionally encumber the right of a capital defendant to present mitigating evidence to a jury.

If there is one constant in Supreme Court jurisprudence, it is that a defendant should be able to present to a jury every aspect of his character and personality for its consideration and assessment. Since *Lockett v. Ohio,* 438 *U.S.* 586, 98 *S.Ct.* 2954, 57 *L.Ed.*2d 973 (1978), the United States Supreme Court has repeatedly held that, consistent with the Eighth and Fourteenth Amendments, a sentencer in a capital case may "not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the

offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 *U.S.* 104, 110, 102 *S.Ct.* 869, 874, 71 *L.Ed.*2d 1, 8 (1982) (finding that sentencer's refusal to consider defendant's youth and turbulent family history violated the Eighth and Fourteenth Amendments) (quoting *Lockett, supra*, 438 *U.S.* at 604, 98 *S.Ct.* at 2964–65, 57 *L.Ed.*2d at 990).

In *State v. Davis*, 96 *N.J.* 611, 619, 477 *A.*2d 308 (1984), we noted that at a capital sentencing proceeding, "a defendant is entitled to the use of all reliable, helpful information." Indeed, sentencing deliberations may appropriately take into account factors that would not satisfy conventional evidential standards. "[T]he sentencing process should embrace an evidential inquiry 'broad in scope, largely unlimited either as to the kind of information that may be considered, or the source from which it may come.'" *Id.* at 620, 477 *A.*2d 308 (quoting *United States v. Tucker*, 404 *U.S.* 443, 446, 92 *S.Ct.* 589, 591, 30 *L.Ed.*2d 592, 596 (1972)). Little will remain of the constitutional rights guaranteed by *Eddings* and *Lockett* if the State may encumber those rights by an illogical inference that the defendant's evidence in mitigation is less worthy of weight because the victim in the matter before the court is more worthy than another.

There are two additional problems. First, the statute mandates that only those members of the jury that find the catch-all mitigating factor may consider the victim impact evidence and that the other jurors must disregard it. Such an instruction is almost fatuous. There is little chance that members of a jury that hear evidence about who was murdered and the effect of the murder on the victim's family will be able to put that evidence out of their minds merely because they do not find the catch-all mitigating factor. For this Court to sustain a statute that depends on that kind of jury instruction undermines much of the credibility that we have earned in the course of our diligent efforts to ensure that death penalty prosecutions are fair to both the State and the defense. I do not believe that we should give a jury instruction

that is all but impossible to follow. To do so discredits the legitimacy of the capital punishment process that we have erected.

A second concern is that the statute will virtually compel defense attorneys to shoehorn the mitigating evidence that previously was introduced under the catch-all factor into one of the other mitigating factors, most likely factors c(5)(a), c(5)(d), and c(5)(e). Those factors read as follows:

> c(5)(a) The defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution;
>
> . . . .
>
> c(5)(d) The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as the result of mental disease or defect or intoxication, *but not to a degree sufficient to constitute a defense to prosecution[.];*
>
> c(5)(e) The defendant was under unusual and substantial duress insufficient to constitute a defense to prosecution.
>
> [*N.J.S.A.* 2C:11–3c(5) (emphasis added).]

Inevitably, defense counsel will attempt to use evidence about the defendant's upbringing and background to prove that the defendant's emotional condition was such as to fit within the broad confines of those three mitigating factors to avoid the effect of the statute. Defense counsel who do not make that effort will be questioned because the consequences of relying on the c(5)(h) factor could be so potentially devastating. And even more paradoxically, the Court itself may have to take steps to ensure that the c(5)(h) evidence is introduced on the trial court's own initiative, not the defendant's. *See State v. Hightower,* 120 *N.J.* 378, 415, 577 *A.*2d 99 (1990) (mandating that mitigating factors be presented in every capital case, even over defendant's objection, to ensure reliability of sentencing process). In short, following the statute may result in less victim impact evidence, not more.

I would not resist enforcement of the statute so strongly if there were no alternative. But there is an alternative, and it is simple, relatively uncontroversial and consistent with the Court's opinion in *State v. Williams,* 113 *N.J.* 393, 550 *A.*2d 1172 (1988), the only

case in which the Court heretofore has spoken at length about victim impact evidence. We said in *Williams:* "Any capital trial will necessarily involve testimony and physical evidence pertaining to the victim. This evidence, though admissible, cannot be used in a manner calculated to so confuse or impassion the jury that it inappropriately intertwines irrelevant emotional considerations with relevant evidence." *Id.* at 451, 550 *A.*2d 1172.

Accordingly, I would hold that properly qualified and limited victim impact evidence should be admissible in every capital prosecution. Its use reinforces the bonds of common humanity that link the jury, the collective conscience of the community, to the administration of the death penalty. A necessary corollary to the general admission of victim impact evidence is that the jury should understand that no victim's life is more worthy than that of another but that each victim's life, and that of the defendant, is unique. I therefore would hold invalid that portion of *N.J.S.A.* 2C:11–3c(6) that would instruct the jury that it should consider the victim impact evidence "in determining the appropriate weight to give mitigating evidence presented pursuant to subparagraph (h) of paragraph (5) of this subsection [the catch-all factor]." What possible logical relevance can the status of the victim have to the probative weight to be given to the circumstances of a defendant's life? Does an abused childhood become less so because the child become man has killed a Nobel Prize winner? Or, put the other way, would an abused childhood be any more of a mitigating factor because the defendant had killed a prostitute or a homeless vagrant? The illogic of the proposition is obvious.

We should follow what the people of the State of New Jersey have, through the constitutional amendment, stated to be the clear expression of State policy—to allow to the fullest extent possible the use of victim impact evidence in capital cases when it is used to present to the jury, not the worthier status of the victim's life, but rather only the unique personality of the victim and the victim's family as sharers in the common humanity that links the administration of the death penalty to the "evolving standard[s] of

decency" that define cruel and unusual punishment. *Spaziano v. Florida*, 468 *U.S.* 447, 483, 104 *S.Ct.* 3154, 3174, 82 *L.Ed.*2d 340, 368 (1984) (Stevens, J., concurring in part and dissenting in part) (quotation omitted). Without the distortion created by the statute, juries would understand the valid purpose of such evidence, that is, to gain an understanding of the unique personality of the victim as well as that of the defendant. *Payne, supra*, 501 *U.S.* at 825, 111 *S.Ct.* at 2608, 115 *L.Ed.*2d at 735.

Just as we would not accept in *Zola, supra*, the argument that the briefest statement by the defendant would inject a fatal emotionalism into the jury's deliberations, so too, a measured statement from the murder victim's family as to how the killing has affected their lives need not be prejudicially emotional. The common law has always sought a reasoned judgment from juries. Thus, we have developed over time the rules of evidence that laypersons at times find counterintuitive. (For example, we do not tell guilt juries that an accused is a previous offender.) There is always a danger in departing from those settled rules of law. There is a danger that victim impact evidence might degenerate, as we have observed in sentencing statements, into vitriolic emotional attacks upon the character and, sometimes, upon the humanity of the defendant. It is that danger against which courts must guard. Justice Frankfurter once wrote that "[l]aw triumphs when the natural impulses aroused by a shocking crime yield to the safeguards which our civilization has evolved for an administration of criminal justice at once rational and effective." *Watts v. Indiana*, 338 *U.S.* 49, 55, 69 *S.Ct.* 1347, 1350, 93 *L.Ed.* 1801, 1807 (1949).

I thus believe that a delicate balance between an understanding by the jury of the common humanity of victims and defendant and the strict procedures of the common law can be fairly accomplished. In all of our cases we have emphasized that balance. In *Williams, supra*, 113 *N.J.* at 447, 550 *A.*2d 1172, we condemned emotional appeals based on the victim's character. The victim's hopes and plans were characterized as having been brutally

destroyed by the defendant. The Court said that the prosecutor's "overzealous advocacy" had the "same effect as would a deliberate plan to induce the jury to reach a verdict based on the victim's virtuous character." *Ibid.* Despite the inherent emotion in a capital case, to avoid the arbitrary and capricious imposition of the death penalty is fundamental. *Id.* at 454, 550 *A.*2d 1172. "It is constitutionally required that juries in capital trials reach a verdict and impose a penalty without inordinate exposure to unduly prejudicial, inflammatory commentary." *Id.* at 453, 550 *A.*2d 1172. The established parameters within which the status of the victim in a capital case may be presented to a jury are established by our tradition and laws.

In *State v. Coyle*, 119 *N.J.* 194, 231–32, 574 *A.*2d 951 (1990), we recognized the prejudice inherent in arguments that suggest that a verdict be returned out of sympathy for the surviving members of the victim's family. The Court then found improper and prejudicial an appeal to juror sympathy in penalty phase comments concerning the victim's children and their loss of a father's love and guidance. *See also Pennington, supra,* 119 *N.J.* at 568–69, 575 *A.*2d 816 (disapproving prosecutor's emphasis on victim's family relationship and appeal not to dishonor her memory); *State v. Harvey*, 121 *N.J.* 407, 425, 581 *A.*2d 483 (1990) (disapproving references to victim's recent widowhood and importance of trial to her family), *cert. den.,* 499 *U.S.* 931, 111 *S.Ct.* 1336, 113 *L.Ed.*2d 268 (1991); *Clausell, supra,* 121 *N.J.* at 339–41, 580 *A.*2d 221 (disapproving contrast of defendant's lifestyle with family activities of victim and his children).

From those cases, we may derive the constant theme that our trial judges must protect jurors from illegitimate influences that threaten to taint their verdict. *In re Kozlov,* 79 *N.J.* 232, 239–40, 398 *A.*2d 882 (1979).

Thus circumscribed, I would permit victim impact evidence in every capital case. I would not condition the use of that evidence on the defendant's exercise of a constitutional right to present mitigating evidence. I would not unconstitutionally distort the

limited purpose for which that evidence may be offered—an expression of the unique personality of the victim—by instructing the jury that the defendant's evidence in mitigation is rebutted by some aspect of the character and personality of the victim.

In *State v. Ramseur*, 106 *N.J.* 123, 190, 524 *A.*2d 188 (1987), we said that Article I, paragraph 12 of the New Jersey Constitution requires "consistency and reliability" in the enforcement of the death penalty. We undermine that consistency and reliability when we unnecessarily inject into capital trials an unconstitutional inference that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy. Such considerations "effectively devalue the deaths of those victims who have no family or those whose relatives are 'less articulate in describing their feelings even though their sense of loss is equally severe.'" *Pennington, supra,* 119 *N.J.* at 570, 575 *A.*2d 816 (quoting *Booth, supra,* 482 *U.S.* at 505, 107 *S.Ct.* at 2534, 96 *L.Ed.*2d at 450).

The United States Supreme Court has never held that victim impact evidence should be admitted specifically and only to counter one aspect of a defendant's life offered in mitigation. Quite to the contrary, the Court has repeatedly emphasized that

> victim impact evidence is not offered to encourage comparative judgments of this kind-for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead *each* victim's "uniqueness as an individual human being," whatever the jury might think the loss to the community resulting from his death might be.

> . . . .

> Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities.

> [*Payne, supra,* 501 *U.S.* at 823, 825, 111 *S.Ct.* at 2607-08, 115 *L.Ed.*2d at 734-35 (emphasis added).]

Remember that in *Payne* the totality of the "evidence of the impact of Payne's offenses during the sentencing phase was [a] grandmother's description—in response to a single question—that

the child [of the victim] misses his mother and baby sister [who was also killed]." *Id.* at 826, 111 *S.Ct.* at 2609, 115 *L.Ed.*2d at 735.

We should not create another cloud over the death penalty by asking victim impact evidence to shoulder the unconstitutional assignment of creating an impermissible inference that defendants "whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy." *Id.* at 823, 111 *S.Ct.* at 2607, 115 *L.Ed.*2d at 734.

HANDLER, J., dissenting.

The Court now decides that, in a capital prosecution, evidence about a murder victim's character and background and the effect of the murder on the victim's survivors may be used to decide whether a defendant should be executed. Such "victim-impact" evidence destroys any possibility that the death penalty will be administered in a fair and just manner. I, therefore, dissent from the Court's opinion.

There are compelling reasons of constitutional dimension that foreclose the use of victim-impact evidence to determine the death penalty:

First, expanding "relevant evidence" to include victim-impact evidence will effectively prevent a jury from rendering a death penalty verdict based on the defendant's character and the circumstances of the crime. Evidence about the crime victim has always been admissible in a capital prosecution when it is relevant to guilt or innocence. Victim-impact evidence, as now authorized, however, is not relevant to criminal guilt or innocence. A death sentence must be based on a determination of the defendant's death-worthiness in terms of his or her character and the circumstances of the case. The constitutionality of the death penalty based on that determination hinges on the requirement that clear standards guide jury discretion. A jury's consideration of victim-impact evidence, as now authorized by the Court, cannot be controlled by any standards. Jurors will not be capable of disregarding victim-impact evidence's extreme prejudicial effects or avoiding its dis-

torting and devastating impact. Thus, victim-impact evidence will inevitably derail the jury's function and purpose, resulting in the unconstitutional imposition of the death penalty.

Additionally, as presently envisaged under the statute, the procedural scheme for admission and consideration of the evidence is illogical and confusing. The evidence may be admitted only if the defendant introduces a specific type of mitigating evidence and must be used for the limited purpose of evaluating or weighing that specific mitigating evidence. However, victim-impact evidence is not in any sense relevant to the mitigating factors and, therefore, cannot realistically or rationally aid a juror's particularized evaluation of mitigating evidence. Moreover, because victim-impact evidence may be introduced if a defendant presents certain mitigating evidence, it will discourage, and impermissibly burden, a defendant from proffering mitigating evidence.

The injection of victim-impact evidence into the determination of whether a defendant lives or dies will render proportionality review unmanageable and incomprehensible. That ultimate constitutional check against the disparate and arbitrary imposition of the death penalty becomes meaningless with the use of victim-impact evidence.

The status of the victim is a major factor that engenders invidious discrimination in the administration of the death penalty. Inevitably, the statute will have the insidious effect of creating an unacceptable risk that the death penalty will be imposed in an invidious and discriminatory manner.

I explain my views by outlining the statute that authorizes the use of victim-impact evidence in light of state constitutional principles and standards as well as the fundamental principles of death sentencing that are indispensable in the administration of a constitutional system of capital prosecution and punishment. I conclude that victim-impact evidence is incompatible with those principles and is, therefore, unconstitutional. Further, the use of victim-impact evidence should be rejected because it will destroy proportionality review as a statutory and constitutional safeguard. Fi-

nally, and most importantly, victim-impact evidence cannot be tolerated because of its powerful and corrosive potential for invidious discrimination. In sum, victim-impact evidence will destroy a capital defendant's right to a fair determination of his sentence.

I

The imposition of a sentence of death is the most solemn judicial act that government can take. It marks that moment when society decides that one of its members no longer deserves the constitutional right to live. The severity and irreversible nature of the punishment dictates heightened concern about fairness in capital sentencing. Thus, under the New Jersey capital punishment statute, *N.J.S.A.* 2C:11–3, the jury's discretion is carefully circumscribed to generate the greatest assurance that death sentences will be justly imposed.

After a defendant is charged by the State with capital murder and unanimously found by a jury to have committed murder in circumstances that potentially warrant the imposition of the death penalty, a separate sentencing hearing is held. The jury must determine whether certain statutorily-defined aggravating and mitigating factors exist. Each juror individually must determine the existence of each aggravating factor. Only if each and every juror has found an aggravating factor may that factor thereafter be considered in the determination of the sentence. Each juror must then individually decide whether each mitigating factor exists. Mitigating factors may be found to exist by a single juror even though other jurors do not so find. Thereafter, each juror must determine whether the aggravating factors that all jurors have found to exist outweigh beyond a reasonable doubt the mitigating factors as found by that juror. The death penalty is imposed only if all jurors agree, after performing their independent weighing of the factors, that each of them individually is convinced beyond a reasonable doubt that the proven aggravating factors outweigh the mitigating factors. *See generally State v. Ramseur*, 106 *N.J.* 123, 156–60, 524 *A.*2d 188 (1987).

One mitigating factor is *N.J.S.A.* 2C:11–3c(5)(h) ("c(5)(h)"). It is the "catch-all" factor, which can be based on any mitigating evidence not encompassed in the other enumerated mitigating factors. It can additionally be based on evidence already submitted for the other mitigating factors or for any other purpose at trial or sentencing. This factor is, in many cases, critically important.

In 1995, the Legislature approved *N.J.S.A.* 2C:11–3c(6), now generally referred to as "the victim-impact statute." The statute permits the State to present victim-impact evidence during the penalty-phase of a capital trial whenever a defendant presents evidence pursuant to mitigating factor c(5)(h). *N.J.S.A.* 2C:11–3c(6) provides that:

> When a defendant at a sentencing proceeding presents evidence of the defendant's character or record pursuant to subparagraph (h) of paragraph (5) of this subsection, the State may present evidence of the murder victim's character and background and of the impact of the murder on the victim's survivors. If the jury finds that the State has proven at least one aggravating factor beyond a reasonable doubt and the jury finds the existence of a mitigating factor pursuant to subparagraph (h) of paragraph (5) of this subsection, the jury may consider the victim and survivor evidence presented by the State pursuant to this paragraph in determining the appropriate weight to give mitigating evidence presented pursuant to subparagraph (h) of paragraph (5) of this subsection.

The statute both authorizes and limits the use of victim-impact evidence. Under the statute, the introduction of c(5)(h) evidence is the trigger for the admission of victim-impact evidence. That admission, however, does not automatically authorize a juror to consider such evidence. There are two conditions that limit jury consideration of admissible victim-impact evidence. An individual juror must first find that the c(5)(h) factor exists in order to enable that individual juror to consider victim-impact evidence. Then, the juror may use the victim-impact evidence only to determine the weight of evidence presented pursuant to c(5)(h).

The proposed statutory use of victim-impact evidence is extremely complicated and difficult because it is so counter-intuitive. In many situations, victim-impact evidence consists of the victim's family members testifying about their emotional suffering. That

kind of evidence will be admissible even though it is not remotely related to the evidence that a defendant has proffered under the c(5)(h) mitigating factor. For example, a defendant may introduce evidence under c(5)(h) that he had a difficult childhood. In "rebuttal," a victim's spouse may testify about the victim's family's suffering. Jurors are instructed to weigh one against the other.

The facts in this case will surely generate substantial evidence of the impact of the murder on the victim and her survivors. Defendant allegedly murdered an eight-year old child who had been visiting a friend. Defendant apparently knew his victim and her mother. The Court anticipates that this capital prosecution will present virtually all of the profound concerns raised by victim-impact evidence.

## II

### A.

The primary issue in this case is whether victim-impact evidence can constitutionally be permitted in the penalty-phase of a capital trial. We need not spend much time contemplating whether the statute is constitutional under the recently enacted Victim's Rights Amendment. It is constitutional in the sense that the statute was passed by the Legislature and concerns victims' rights. Thus, the statute falls within the broad dictates of the Victim's Rights Amendment. *N.J. Const.*, art. I, ¶ 22 ("A victim of a crime shall be entitled to those rights and remedies as may be provided by the Legislature."). The important question is whether the victim-impact statute is constitutional under the due process and cruel and unusual punishment clauses of the Constitution.

The majority's approach accepts as a fact that the Victim's Rights Amendment meant to subsume New Jersey's constitutional prohibition against cruel and unusual punishment, *N.J. Const.*, art I, ¶ 12, when considering victim-impact legislation. *See ante* at 41, 678 *A.*2d at 173 ("Even if we were inclined to ... interpret the Cruel and Unusual Punishment Clause of our State Constitution

as providing greater protections [than the federal Constitution], the text of the New Jersey Constitution demands that we not pursue such an independent course."). The majority's three justifications are simplistic and erroneous. First, the majority incorrectly believes that the Victim's Rights Amendment "is intended to afford victims whatever rights could be afforded to them without violating the United States Constitution." *Ante* at 44, 678 *A.*2d at 175. Second, the decision to provide greater rights to crime victims does not implicitly repeal rights provided to criminal defendants. Third, the overwhelming legislative support for the victim-impact statute does not foreclose Constitutional review.

The key issue is whether the Legislature and the populace meant to limit the other rights protected by the State Constitution when they enacted the Victim's Rights Amendment. If they did not, then a statute passed pursuant to the amendment that clearly intends to limit other constitutional protections is surely not immune from constitutional challenge. Indeed, the statute would be constitutionally suspect. A review of the history of the Victim's Rights Amendment and the rules governing constitutional construction demonstrate that the amendment was not meant to so limit other constitutional rights.

The history of the amendment unequivocally shows that it was not meant to limit other state constitutional rights. The statement accompanying and supporting the legislative bill makes this clear: "[T]his amendment is not intended in any way to deny or infringe upon the constitutional rights of any person accused of a crime." Senate Judiciary Committee, *Statement to Assembly Committee Substitute for Assembly Concurrent Resolution No. 85* (May 13, 1991). The Legislature could not have drafted the amendment based on the United States Supreme Court's ruling in *Payne v. Tennessee,* 501 *U.S.* 808, 111 *S.Ct.* 2597, 115 *L.Ed.*2d 720 (1991), which removed the *per se* bar against the admissibility of victim-impact evidence based on the Eighth Amendment to the federal Constitution. *Payne* was decided after both the State

Senate and the General Assembly had passed the amendment. In addition, had the amendment meant to limit either the due process clause or the prohibition against cruel and unusual punishment, one would logically expect some debate. No public hearings' for the amendment or debate took place after *Payne* was decided and before the public voted overwhelmingly in favor of the amendment.

The primary purpose of the Victim's Rights Amendment was to provide "the right of victims to be present at public judicial proceedings." Assemblyman Alex DeCroce, *Public Hearing to Assembly Concurrent Resolution No. 85,* at 3 (Dec. 17, 1990). Other people testifying at the hearing focused on the right to be present at trials rather than any right to participate in trials. Witnesses testified about actual experiences of mistreatment: a victim was not informed of her attacker's release, a relative was barred from observing a trial, relatives were not provided a place to wait during jury deliberations, trial postponements inconvenienced a victim, and victims were not notified when hearings were delayed. The New Jersey Coalition of Crime Victims' Organizations's ("NJCCVO") statement supporting the amendment never mentioned victims' participation in trials. It considered the amendment's primary aim to be "to strengthen the rights of victims in public judicial proceedings to be present at appropriate criminal justice proceedings." NJCCVO Statement at 22 (Dec. 5, 1990).

Not only does the history of the amendment support the conclusion that the amendment did not mean to limit other rights protected by New Jersey's Constitution, but general rules of construction support the conclusion as well. In general, different sections of the Constitution should be read to be in harmony, not in conflict. *See National Mut. Ins. v. Tidewater Transfer Co.,* 337 U.S. 582, 618 n. 11, 69 *S.Ct.* 1173, 1191 n. 11, 93 *L.Ed.* 1556 (1949) (Rutledge, J., concurring) ("[The Constitution's] provisions [are] to be read not with the narrow literalism of a municipal code or a penal statute, but so that its high purposes should illumine every

sentence and phrase of the document and be given effect as part of a harmonious framework of government."); *Myers v. United States,* 272 *U.S.* 52, 151, 47 *S.Ct.* 21, 37, 71 *L.Ed.* 160 (1926) ("[When interpreting the Constitution,] real effect should be given to all the words it uses."); *Marbury v. Madison,* 1 *Cranch* 137, 174, 5 *U.S.* 137, 174, 2 *L.Ed.* 60 (1803) ("It cannot be presumed that any clause in the Constitution is intended to be without effect."); *The Federalist No. 40* (James Madison) ("[E]very part of the expression ought, if possible, be made to conspire to some common end."). The appropriate way to harmonize the Victim's Rights Amendment and to give effect to each section of the New Jersey Constitution is not to jump to "whatever rights could be afforded ... without violating the United States Constitution." *Ante* at 44, 678 *A.*2d at 175.

The majority is incorrect to liken the situation to *State v. Harris,* 141 *N.J.* 525, 662 *A.*2d 333 (1995). There, the Court recognized that the Legislature and the public had expressly overridden the Court's ruling in *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988), and had limited the scope of the cruel and unusual punishment clause by amending the Constitution. *Harris, supra,* 141 *N.J.* at 548, 662 *A.*2d 333. The only plausible interpretation of that amendment was that it limited the broad reach this Court had attached to the cruel and unusual punishment clause of the State Constitution. Indeed, the amendment was written directly into the cruel and unusual punishment paragraph of the Constitution and stated that "It shall not be cruel and unusual punishment to impose the death penalty [in circumstances in which this Court had held in *Gerald* it was]." *N.J. Const.,* art. I, ¶ 12. There was no need to harmonize different constitutional provisions or to give effect to competing clauses. Here, the Victim's Rights Amendment does not provide for the introduction of victim-impact evidence, nor does the amendment on its face limit the cruel and unusual punishment clause.

In sum, the Victim's Rights Amendment was not meant to limit the basic rights enshrined by our Constitution. Rather, the

amendment provided much needed protections to crime victims. Therefore, the statute's constitutionality must be determined with an eye toward the entire Constitution.

## B.

Because the Victim's Rights Amendment was not meant to limit the basic rights enshrined by New Jersey's Constitution, the appropriate constitutional inquiry is whether the victim-impact statute violates other constitutional rights. The statute does not violate any right protected by the federal Constitution. The crucial inquiry then is whether the statute violates any right protected by the State Constitution. There are sound reasons for providing rights to the capital defendant under the State Constitution that do not exist under the current interpretation of the federal Constitution.

Our Court is generally guided by the federal Constitution and we have acknowledged that the Court should not diverge from federal constitutional interpretation unless justified by " '[s]ound policy reasons.' " *State v. Stever*, 107 *N.J.* 543, 557, 527 *A.*2d 408 (quoting *State v. Hunt*, 91 *N.J.* 338, 450 *A.*2d 952 (1982)), *cert. denied*, 484 *U.S.* 954, 108 *S.Ct.* 348, 98 *L.Ed.*2d 373 (1987); *see State v. Hempele*, 120 *N.J.* 182, 226, 576 *A.*2d 793 (1990) (O'Hern, J., concurring and dissenting) (stating that the federal Constitution's interpretation cannot be justified simply because the Court disagrees with the United States Supreme Court). Not only are there compelling policy reasons here, but this Court has previously embraced those policy reasons in refusing to permit victim-impact evidence at capital trials.

The United States Supreme Court's treatment of victim-impact evidence under the federal constitution should not be followed because its analysis has been inconsistent and unsound; the Court's decisional authority has become unreliable as an indicator to measure state constitutional rights governing capital punishment. Before 1991, the United States Supreme Court on several occasions found victim-impact evidence to be improper in capital

trials. *South Carolina v. Gathers*, 490 *U.S.* 805, 109 *S.Ct.* 2207, 104 *L.Ed.*2d 876 (1989); *Booth v. Maryland*, 482 *U.S.* 496, 107 *S.Ct.* 2529, 96 *L.Ed.*2d 440 (1987). In 1991, the United States Supreme Court reversed itself. It held that such victim-impact evidence did not violate the federal Constitution. *Payne, supra,* 501 *U.S.* 808, 111 *S.Ct.* 2597, 115 *L.Ed.*2d 720.

The majority now assumes that the shift in constitutional thinking by the United States Supreme Court calls for a similar shift in our own understanding of the State Constitution. We declined to follow that route before. That precise sequence of decisional events took place when this Court determined that it was unconstitutional to permit capital sentencing for murder that was based on an intent to cause only serious bodily injury. The Court refused to follow the zig-zag course of federal constitutional doctrine that eventually came to a different conclusion. In *Enmund v. Florida*, 458 *U.S.* 782, 102 *S.Ct.* 3368, 73 *L.Ed.*2d 1140 (1982), the United States Supreme Court required a homicidal intent as a basis for capital murder. That decision was modified and restricted by the later decision of *Tison v. Arizona*, 481 *U.S.* 137, 107 *S.Ct.* 1676, 95 *L.Ed.*2d 127 (1987). In *State v. Moore*, 113 *N.J.* 239, 301, 550 *A.*2d 117 (1988), and *Gerald, supra,* 113 *N.J.* 40, 549 *A.*2d 792, this Court adhered to the rationale of *Enmund* as being more consonant with state constitutional principles. In the area of victim-impact evidence in capital sentencing, the Court should likewise resist endorsing victim-impact evidence in capital sentencing when it is based solely on a recent about-face by the United States Supreme Court.

Our Court has independently adhered to the principles and rationale of the United States Supreme Court's determination in *Gathers, supra,* and *Booth, supra.* The principled doctrine that prohibits the use of victim-impact evidence was followed consistently and repeatedly. *E.g., State v. Harvey*, 121 *N.J.* 407, 425, 581 *A.*2d 483 (1990), *cert. denied,* 499 *U.S.* 931, 111 *S.Ct.* 1336, 113 *L.Ed.*2d 268 (1991); *State v. Pennington*, 119 *N.J.* 547, 566–75, 575 *A.*2d 816 (1990); *State v. Coyle*, 119 *N.J.* 194, 231–32, 574 *A.*2d 951

(1990); *State v. Williams*, 113 *N.J.* 393, 446–54, 550 *A.2d* 1172 (1988) (*Williams II* ). Thus, the ephemeral authority of the United States Supreme Court in this area is a weak reed against which to lean our own constitutional structure. It does not provide a firm basis on which we can, with any confidence, rest our own constitutional principles. In this context, the "federal decisions are unreliable authority in determining our own constitutional death-penalty jurisprudence." *Williams II, supra*, 113 *N.J.* at 465, 550 *A.2d* 1172 (Handler, J., concurring).

There are two independent bases, in this case, for recognizing state constitutional rights that do not exist under the federal Constitution. These bases are founded in tradition and pre-existing state law. *See State v. Hunt*, 91 *N.J.* 338, 365–68, 450 *A.2d* 952 (1982) (Handler, J., concurring). Both bases demonstrate that the statute violates the New Jersey Constitution.

Our prior decisional law clearly and firmly adopts under the State Constitution the rationale that disallows victim-impact evidence in the penalty trial of a capital case. *E.g. Harvey, supra*, 121 *N.J.* at 425, 581 *A.2d* 483; *Pennington, supra*, 119 *N.J.* at 566–75, 575 *A.2d* 816; *Coyle, supra*, 119 *N.J.* at 231–32, 574 *A.2d* 951; *Williams II, supra*, 113 *N.J.* at 446–54, 550 *A.2d* 1172. Thus, in *Williams II*, the Court wrote that other than allowing victim-impact statements in pre-sentence reports, New Jersey's "criminal laws focus on the culpability of the defendant rather than the virtue of the victim." 113 *N.J.* at 450, 550 *A.2d* 1172.

Since 1991, notwithstanding the United States Supreme Court's reversal of direction in *Payne*, this Court has twice considered and twice curtailed the use of victim-impact evidence. Thus, this Court has consistently found a constitutional bar to victim-impact evidence when unrelated to the substantive issue of guilt or to the penalty to be imposed. In *State v. Bey*, 129 *N.J.* 557, 597–98, 610 *A.2d* 814 (1992) (*Bey III* ), *cert. denied*, —— *U.S.* ——, 115 *S.Ct.* 1131, 130 *L.Ed.2d* 1093 (1995), the Court ruled that the prosecution should not have been allowed to introduce articles of the victim's clothing except items used to choke the victim, the victim's

purse, and items with forensic evidence. The Court quoted *Williams II* in stating that victim-impact evidence carries the risk that a jury will "inappropriately intertwine irrelevant emotional considerations with relevant evidence." *Id.* at 598, 610 *A*.2d 814. In *State v. Martini*, 131 *N.J.* 176, 619 *A*.2d 1208 (1993), *cert. denied*, —— *U.S.* ——, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995), the Court permitted testimony about how the perpetrator terrorized the victim and his spouse while seeking ransom during a kidnapping because the victims' terror was part of the overall kidnapping plan, not simply victim-impact, which would be "an unintended and unforeseeable side effect on a victim's family member." *Id.* at 249, 619 *A*.2d 1208. The Court, nevertheless, "recognized that prosecutorial comments that tend to overemphasize the character of the victim or the impact of the murder on the victim's family are improper in *Williams II* and *Pennington.*" *Id.* at 247, 619 *A*.2d 1208 (citations omitted). Justice Garibaldi further noted in *State v. Biegenwald* that *Payne* left open the possibility that victim-impact evidence would not be permitted under the state Constitutions. 126 *N.J.* 1, 92–93, 594 *A*.2d 172 (1991) (*Biegenwald III* ) (Garibaldi, J., dissenting) (citing *State v. Clausell*, 121 *N.J.* 298, 341, 580 *A*.2d 221 (1990); *Pennington, supra*, 119 *N.J.* at 566–67, 575 *A*.2d 816; and *Williams II, supra*, 113 *N.J.* at 452, 550 *A*.2d 1172); *see State v. Erazo*, 126 *N.J.* 112, 164, 594 *A*.2d 232 (1991) (Handler, J., concurring and dissenting) (explaining that the New Jersey Constitution requires more rigorous scrutiny of victim-impact evidence than under federal Constitution and bars such evidence); *see also State v. Jackson*, 128 *N.J.* 136, 152, 607 *A*.2d 974 (1992) (Handler, J., dissenting) (stating that victim-impact evidence is not permitted because it could divert the jury's attention from the key to capital sentencing: identifying and weighing statutory aggravating and mitigating factors).

In addition, there is strong justification grounded in New Jersey's traditions to provide broader State constitutional protections against the use of victim-impact evidence in capital trials. Victim-impact evidence is fundamentally inconsistent with New Jersey's history of criminal sentencing and, more generally, criminal pun-

ishment. Before *Booth, supra,* 482 *U.S.* 496, 107 *S.Ct.* 2529, 96 *L.Ed.*2d 440, nothing in the history of capital jurisprudence, either before or since the Declaration of Independence, considered or approved victim-impact evidence. *Payne, supra,* 501 *U.S.* at 857–58, 111 *S.Ct.* at 2626, 115 *L.Ed.*2d at 757 (Stevens, J., dissenting). The use of victim-impact evidence grows out of the contemporary victims' rights movement. Markus Dirk Dubber, *Regulating the Tender Heart when the Axe is Ready to Strike,* 41 *Buff. L.Rev.* 85 (1993) (noting primary areas for reform have been victim restitution and victims' participation in legal proceedings—particularly in sentencing); Patrick M. Fahey, Payne v. Tennessee: *An Eye for an Eye and Then Some,* 25 *Conn. L.Rev.* 205, 208 n. 14 (1992) (noting that with emergence of concept of "king's peace," criminal violations became viewed as having been committed against the State rather than the individual).

New Jersey's traditions embody a strong policy commitment to retributive punishment. That is exemplified by the requirements of uniformity and consistency reflected in the Code of Criminal Justice and our many decisions explaining our system as one based on "just desserts." *See State v. Pillot,* 115 *N.J.* 558, 569–78, 560 *A.*2d 634 (1989); *State v. Dunbar,* 108 *N.J.* 80, 86, 527 *A.*2d 1346 (1987); *State v. Yarbough,* 100 *N.J.* 627, 637–38, 498 *A.*2d 1239 (1985), *cert. denied,* 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986); *State v. Roth,* 95 *N.J.* 334, 345–51, 471 *A.*2d 370 (1984). Only in unusual circumstances does that sentencing philosophy permit consideration of the defendant's character. *E.g., State v. Jarbath,* 114 *N.J.* 394, 555 *A.*2d 559 (1989). Even though capital punishment entails "individualized" sentencing determinations, which require evidence of the defendant's character, it does not otherwise depart from the retributive goal of punishment. The use of victim-impact evidence contradicts that dominant philosophy because it focuses on the worth of the victim rather than the character or record of the defendant and the circumstances of the crime.

Moreover, our laws governing the imposition of the death sentence are distinctive, and reflect concerns that are of unique significance to this State's public policy in the administration of capital punishment. *See* discussion, *infra* at 84, 678 *A*.2d at 194–195. The Court has often turned to the New Jersey Constitution as the basis for its capital sentencing procedures. Its tradition has in many important respects evolved independently from the history of the death penalty under the federal Constitution. *See, e.g., Biegenwald III, supra*, 126 *N.J.* at 22–45, 594 *A*.2d 172 (imposing strict standards relating to pretrial publicity); *State v. Kiett*, 121 *N.J.* 483, 582 *A*.2d 630 (1990) (holding capital punishment may not be imposed on juvenile); *Gerald, supra*, 113 *N.J.* 40, 549 *A*.2d 792 (requiring intent to commit murder as basis for capital punishment); *State v. Koedatich*, 112 *N.J.* 225, 329–32, 548 *A*.2d 939 (1988) (mandating direct appeal), *cert. denied*, 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed*.2d 803 (1989); *Ramseur, supra*, 106 *N.J.* at 299–304, 524 *A*.2d 188 (recognizing non-unanimous verdict). In particular, the Court has held that the New Jersey Constitution provides additional and more expansive protections against arbitrary, non-individualized death penalty sentencing. *Koedatich, supra*, 112 *N.J.* at 332, 548 *A*.2d 939.

Those principles inform our analysis of the constitutionality of victim-impact evidence. As already noted, this Court's decisions relating specifically to the use of victim-impact evidence were based equally and independently on state authority. *E.g., Martini, supra*, 131 *N.J.* at 247, 619 *A*.2d 1208 (noting that victim-impact evidence is inconsistent with New Jersey laws); *Williams II, supra*, 113 *N.J.* at 453–54, 550 *A*.2d 1172 (same). The consistent reference to a state basis for barring victim-impact evidence supports an interpretation of our State Constitution that adheres to the enhanced protections that must be afforded a capital defendant and requires a ban on victim-impact evidence, which will inevitably destroy any possibility that the death sentence can be justly and fairly imposed.

## III

The indispensable principle that controls New Jersey's capital jurisprudence is that punishment be related to the blameworthiness of the defendant. Capital sentencing requires an individualized determination that reflects the defendant's blameworthiness. That determination is based on an exclusive focus on the character of the defendant and the circumstances of the crime. *Biegenwald III, supra,* 126 *N.J.* at 92, 594 *A.*2d 172 (Garibaldi, J., dissenting). This fundamental tenet is reflected in our decisions. *E.g., Martini, supra,* 131 *N.J.* at 247, 619 *A.*2d 1208; *Pennington, supra,* 119 *N.J.* at 571, 575 *A.*2d 816; *Williams II, supra,* 113 *N.J.* at 417, 550 *A.*2d 1172.

For a capital sentencing scheme to be constitutional, the punishment of death cannot be "wantonly and . . . freakishly imposed." *Furman v. Georgia,* 408 *U.S.* 238, 310, 92 *S.Ct.* 2726, 2763, 33 *L.Ed.*2d 346, 390 (1972) (Stewart, J., concurring). Therefore, the United States Supreme Court has upheld only those death penalty schemes that provide at the penalty phase for an individualized determination of the propriety of the death sentence by focusing the jury's attention on the circumstances of the crime and the character of the defendant. *Zant v. Stephens,* 462 *U.S.* 862, 879, 103 *S.Ct.* 2733, 2743–44, 77 *L.Ed.*2d 235, 251 (1983); *Gregg v. Georgia,* 428 *U.S.* 153, 188–95, 96 *S.Ct.* 2909, 2932–36, 49 *L.Ed.*2d 859, 883–87 (1976). *See generally Weems v. United States,* 217 *U.S.* 349, 367, 30 *S.Ct.* 544, 549, 54 *L.Ed.* 793 (1910) ("[I]t is a precept of justice that punishment for crime should be graduated and proportioned to the offense."). Indeed, trial courts can exclude from the penalty phase, "as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Lockett v. Ohio,* 438 *U.S.* 586, 604 n. 12, 98 *S.Ct.* 2954, 2965 n. 12, 57 *L.Ed.*2d 973, 990 n. 12 (1978). The underlying principle is that "punishment should be directly related to the personal culpability of the criminal defendant." *Penry v. Lynaugh,* 492 *U.S.* 302, 319, 109 *S.Ct.* 2934, 2947, 106 *L.Ed.*2d 256, 278 (1989).

This Court has repeatedly recognized that our death penalty scheme is constitutional *only* because it provides the individualized determination of the character of the defendant and the circumstances of the offense that the United States Supreme Court has demanded. *See State v. Hightower,* 120 *N.J.* 378, 415, 577 *A.*2d 99 (1990) (holding that the introduction of mitigating evidence is necessary so that the jury can fulfill its role in making an individualized determination); *Gerald, supra,* 113 *N.J.* at 103, 549 *A.*2d 792 (finding evidence is only admissible if relevant to "defendant's character or record, or the circumstances of the offense"); *see also Ramseur, supra,* 106 *N.J.* at 294, 524 *A.*2d 188 (recognizing that jury was not precluded " 'from considering as a mitigating factor, any aspect of a defendant's character or record and of the circumstances of the offense' " (quoting *Lockett v. Ohio, supra,* 438 *U.S.* at 604, 98 *S.Ct.* at 2964, 57 *L.Ed.*2d at 990)). Indeed, these two characteristics are the key to proportionality review. *State v. DiFrisco,* 142 *N.J.* 148, 165, 662 *A.*2d 442 (1995) (*DiFrisco II* ), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996).

Victim-impact evidence is not relevant to a defendant's character; the primary argument offered in support victim-impact evidence is that the impact of the murder on survivors is a circumstance of the crime. However, given the context in which victim-impact evidence is intended to be used, that argument is not tenable.

First, that analysis is not concerned with evidence that is an integral part of the criminal plan or is relevant to the determination of guilt. As discussed earlier, *supra,* at 40, 678 *A.*2d at 173, such evidence is admitted for a reason wholly unrelated to the basis for general victim-impact evidence. The proper analysis, therefore, focuses on whether evidence that is *not* "an essential component of the total integrated criminal plan" is truly relevant to the circumstances of the crime. *Martini, supra,* 131 *N.J.* at 246, 619 *A.*2d 1208.

The State argues that victim-impact evidence has probative value for sentencing purposes because criminal statutes can link

sentencing to the harm inflicted by the commission of the crime. Under that approach, proponents cite two examples: drunk drivers who crash and kill a bystander are sentenced more harshly than drunk drivers who crash and merely injure a bystander; and people who attempt to kill and succeed can be sentenced more harshly than people who attempt to kill but fail. *Payne, supra,* 501 *U.S.* at 819, 111 *S.Ct.* at 2605, 115 *L.Ed.*2d at 731; *Booth, supra,* 482 *U.S.* at 516–17, 107 *S.Ct.* at 2540, 96 *L.Ed.*2d at 457 (White, J., dissenting).

The two examples cited illuminate certain criteria necessary to use the effects of the offense in sentencing: the harm must be foreseeable to the defendant, the legislature must specify the harm defining the substantive measure of the crime, and the legislature must explicitly express its judgment that a class of harm deserves harsher punishment. *Payne, supra,* 501 *U.S.* at 863, 111 *S.Ct.* at 2629, 115 *L.Ed.*2d at 760 (Stevens, J., dissenting). Victim-impact evidence as it has been authorized does not meet any of those requirements for enhancing criminal culpability or punishment. Victim-impact evidence is not and will not be limited to situations in which the consequential harm was foreseeable to the defendant. The Legislature, moreover, has not identified or specified, nor has it posited, any kind of harm that must be demonstrated by victim-impact evidence in order to warrant harsher punishment. The statute and the majority place no limits on the type of impact on the victim's survivors that victim-impact evidence may demonstrate. The Legislature, through this statute, allows jurors unfettered discretion to use victim-impact evidence without any guidance in weighing whatever type of c(5)(h) evidence the defendant may have introduced.

The State also argues that victim-impact evidence is permissible because existing aggravating factors reflect a social judgment that a defendant's moral culpability can be assessed by the status and characteristics of the victim. The State refers to aggravating factors c(4)(h) (killing of a child) and c(4)(k) (killing of a public

servant), as authority for the notion that a victim's status bears on a defendant's culpability.

Not only is there no analogy between those aggravating factors and victim-impact evidence, but the function of the c(4)(h) and c(4)(k) factors demonstrates the flaw in the attempt to interject victim-impact evidence into capital punishment. The Legislature itself has enacted the specific aggravating factors of c(4)(h) and c(4)(k). Moreover, it has narrowly defined the c(4)(h) and c(4)(k) characteristics. Victim-impact evidence is very different from other kinds of evidence relating to a victim that might otherwise and in other contexts become germane in defining criminal liability or assessing criminal punishment. Fahey, *supra,* 25 *Conn. L.Rev.* at 245 (remarking that aggravating factors permit no inquiry into the victim's status, society, family, or performance).

There is an equally compelling reason why victim-impact evidence undermines the constitutionality of the capital punishment scheme. Not only does victim-impact evidence have little or no relevance to the defendant's blameworthiness, victim-impact evidence turns the focus from the defendant's blameworthiness to the victim's worthiness. This shift in direction offends the fundamental constitutional requirement that capital sentencing provide an individualized determination of the defendant's blameworthiness.

The Court, however, ignores how victim-impact evidence can tend to establish the worthiness of the victim and tend to be used to compare the relative worth of the victim and the defendant.

The view of the Court is either naive or disingenuous. Prosecutors will not offer and jurors will not use victim-impact evidence only to humanize the victim. The undeniable effect of victim-impact evidence is that it will be used to demonstrate the value of the victim. *See Jackson, supra,* 128 *N.J.* at 153, 607 *A.*2d 974 (Handler, J., dissenting). An inescapable consequence is that jurors will compare the two sets of character testimony. *Ibid.* (noting danger that victim-impact evidence will create a "contest between the defendant and [his or her] victim"); *State v. Marshall,* 123 *N.J.* 1, 238–39, 586 *A.*2d 85 (1991) (Handler, J., dissent-

ing) (finding that State's improper references to victim's "civic-mindedness" diverted the jury's attention from defendant's mitigating factors to victim's worthiness); Vivian Berger, *Payne and Suffering: A Personal Reflection and a Victim–Centered Critique*, 20 *Fla.St.U.L.Rev.* 21, 46 (1992) (stating the "paeans to the deceased's virtues [must surely be] aimed at inviting jurors to make some sort of comparative judgments (whether among various victims or between the victim and the defendant")). Moreover, prosecutors have never selected victim-impact evidence solely for the purpose of showing how the victim was a unique human being. Common sense and experience tell us that the purpose of using victim-impact evidence must be to show how a victim was a valuable person. The predictable effect of victim-impact evidence is "to enhance certain victims by identifying them as worthier than others of society's highest measure of concern." Berger, *supra*, 20 *Fla.St.U.L.Rev.* at 46.

Proponents of victim-impact evidence argue that it will level the playing field by introducing information about the victim that the jury hears about the defendant. The desire for a level playing field in the context of capital sentencing is inappropriate, unjustifiable, and facile. There are many fundamental differences between the defendant's rights and the State's rights in criminal prosecutions. Defendants are guaranteed rights that serve to protect them from possible State overzealousness and excesses. It is undisputed that: the State must prove guilt beyond a reasonable doubt yet defendants have no burden of proof; the State may not appeal acquittals but the defendants may appeal convictions; and capital sentencing can only involve narrowly defined aggravating factors but must not involve too narrowly defined mitigating factors. Capital sentencing is not a game that calls for a level playing field. Even in the context of victim-impact evidence, there is no level playing field. A capital defendant's character can constitute a mitigating circumstance. Nevertheless, "[t]he victim is not on trial; her character, whether good or bad, cannot therefore constitute either an aggravating or mitigating

circumstance." *Payne, supra,* 501 *U.S.* at 859, 111 *S.Ct.* at 2627, 115 *L.Ed.*2d at 758 (Stevens, J., dissenting).

## IV

Victim-impact evidence cannot be used for the purpose intended by the statute. The statute imposes an irrational requirement, one that is impossible of fulfillment and one that will be explosively prejudicial when it is attempted to be followed. The statute is grossly unfair for several other reasons: it hinders capital defendants' right to present mitigating evidence, it introduces a *de facto* aggravating factor, it is so confusing that it violates capital defendants' right to clear jury instructions, and it introduces unrebuttable evidence of the victim's worth.

A fundamental problem with the victim-impact statute is that there is no rational basis for using the evidence in the manner the statute requires. The majority concedes that victim-impact evidence must be "relevant and reliable." *Ante* at 47, 678 *A.*2d at 176. It fails, however, to explain in what way that evidence is relevant.

The victim-impact statute limits the use of victim-impact evidence to "determining the appropriate weight to give mitigating evidence presented pursuant to [the c(5)(h) factor]." *N.J.S.A.* 2C:11–3c(6). The statute yields no clue about how descriptions of the impact on the victim's family or descriptions of the victim's uniqueness as a human being contribute to deciding how much weight c(5)(h) mitigating evidence deserves. The majority's procedural restrictions to the statute also fail to provide any meaningful guidance.

Victim-impact evidence has no tendency to rebut the c(5)(h) factor, nor does it have any capacity to serve as a counterweight to c(5)(h) evidence. It could serve as rebuttal only if the c(5)(h) evidence focuses on the victim and argues that the victim was not unique or had no survivors. No capital defendant ever makes such arguments. In the most common situation, the c(5)(h) evidence relates to the defendant's abusive childhood environment.

*See, e.g., Bey III, supra,* 129 *N.J.* at 586–88, 610 *A.*2d 814; *Biegenwald III, supra,* 126 *N.J.* at 14, 594 *A.*2d 172. Such evidence may also relate to parental neglect of the defendant, *Bey III, supra,* 129 *N.J.* at 588–89, 610 *A.*2d 814, the defendant's early substance abuse, *id.* at 590, 610 *A.*2d 814, and the defendant's limited education, *DiFrisco II, supra,* 142 *N.J.* at 197, 662 *A.*2d 442. Evidence of the defendant's abusive childhood and blighted life, however, would in no way be offset by evidence of the victim's social value or how much the victim's friends and family miss the victim and suffer from the victim's death. They are completely different subjects. Victim-impact evidence also has no ability to contradict such varied forms of c(5)(h) evidence as service in the armed forces, *State v. Long,* 119 *N.J.* 439, 459, 575 *A.*2d 435 (1990), or singing in a church choir, *DiFrisco II, supra,* 142 *N.J.* at 197, 662 *A.*2d 442.

The majority argues for the rebuttal use of victim-impact evidence from an analogy based on the use of impeachment evidence. It states that "no one would claim that the State's right to challenge the defendant's credibility or to introduce his prior record [after he testifies] presents a constitutionally prohibited practice." *Ante* at 39, 678 *A.*2d at 172. That analogy does not apply, however, when there is no logical or substantive relationship between the rebuttal evidence and what it purportedly rebuts. There is little explanation of how descriptions of the impact on the victim's family and of the victim's uniqueness inform or guide a juror's discretion regarding how much weight to give the descriptions of, for example, the defendant's difficult childhood. Thus, the evidence offered ostensibly for the purpose of rebuttal does not have any traditional or genuine rebuttal purpose and no purpose as a counterweight. The victim's family's suffering and the victim's uniqueness do not undermine, contradict, or impugn the evidence of a defendant's lifetime of difficulties.

Capital defendants have a right to introduce all relevant mitigating evidence. *Eddings v. Oklahoma,* 455 *U.S.* 104, 114, 102 *S.Ct.* 869, 876–77, 71 *L.Ed.*2d 1, 11 (1982). Indeed, this Court insists

that a capital defendant provide mitigating evidence. *Hightower,* *supra,* 120 *N.J.* at 415, 577 *A.2d* 99; *Koedatich, supra,* 112 *N.J.* at 331–32, 548 *A.2d* 939. The capital-punishment statute, by its inclusion of the catch-all factor c(5)(h), and this Court's interpretation and application of its provisions reflect the understanding that mitigating evidence must be generously allowed. *E.g. State v. Davis,* 96 *N.J.* 611, 620, 477 *A.2d* 308 (1984). The authorization to use victim-impact evidence that is triggered by a defendant's introduction of certain mitigating evidence completely upsets the free admissibility of the defendant's redeeming qualities that is essential in a constitutional capital punishment scheme.

The State is entitled to rebut that evidence with proof of its own. *Dawson v. Delaware,* 503 *U.S.* 159, 168, 112 *S.Ct.* 1093, 1099, 117 *L.Ed.2d* 309, 319 (1992) (accepting "[t]he principle of broad rebuttal" that would permit any bad character evidence); *State v. Rose,* 112 *N.J.* 454, 503, 548 *A.2d* 1058 (1988). Nevertheless, the State's evidence may not be as freely admitted as that proffered by a defendant. *See, e.g., Davis, supra,* 96 *N.J.* 611, 477 *A.2d* 308 (indicating that evidence offered by State must adhere to rules of evidence).

The majority asserts that "the defendant is no more restricted from introducing evidence relevant to the catch-all evidence than he would in introducing evidence relevant to any other mitigating factor." *Ante* at 40, 678 *A.2d* at 173. Clearly, however, the victim-impact statute restricts defendant's use of c(5)(h) evidence more than his resort to other mitigating evidence.

Defendants are faced with the danger of rebuttal evidence whenever they present evidence under any mitigating factor. *See Dawson v. Delaware, supra,* 503 *U.S.* at 167–68, 112 *S.Ct.* at 1099, 117 *L.Ed.2d* at 318–19. As the majority points out, defendants are constantly forced to make difficult choices and the rights they sacrifice are monumental. *Ante* at 40, 678 *A.2d* at 173. However, the use of victim-impact evidence in rebuttal exposes defendants to the danger of a form of rebuttal that is not in any way related

to the evidence and, worse, goes well beyond the defendant's mitigating evidence.

Victim-impact evidence impermissibly serves as a *de facto* aggravating factor that will counterbalance all mitigating factors. Under lawful capital punishment procedures, the jurors' only step after determining the aggravating and mitigating factors is to weigh them. The victim-impact statute attempts to create a new intermediate deliberative step: the weighing of the c(5)(h) mitigating evidence. The sole purpose of that step is to influence the ultimate weighing of the aggravating and mitigating factors. The jurors are not permitted to rescind their finding of the c(5)(h) factor, although a juror may find that the c(5)(h) evidence is totally outweighed by the victim-impact evidence. It is inevitable that jurors will therefore discuss the weight of all the aggravating and mitigating evidence in considering the weight of the c(5)(h) evidence and the victim-impact evidence. After all, the weight of the c(5)(h) evidence has no meaning in a vacuum but derives its meaning only when compared with the other aggravating and mitigating factors.

In addition, jurors will often face evidence that supports the c(5)(h) factor, but *whose* weight must not be affected by the victim-impact evidence. Defendants have the right to ask the jurors to consider mitigating evidence submitted pursuant to any other mitigating factor when they weigh the c(5)(h) factor. *Bey III, supra*, 129 *N.J.* at 613–16, 610 *A.2d* 814. The victim-impact evidence may not be used to counter the weight of such evidence because the defendant did not submit it "pursuant to [c(5)(h)]." *N.J.S.A.* 2C:11–3c(6). The jurors' analysis of the weight of the c(5)(h) evidence must, therefore, be excruciatingly splintered: they must consider victim-impact evidence in weighing the evidence submitted pursuant to c(5)(h) in a vacuum that ignores all other aggravating and mitigating factors and also ignores the c(5)(h) factor itself because that factor encompasses mitigating evidence submitted pursuant to other mitigating factors. Not only does that procedure require complex mental gymnastics but it

puts grave doubts on the capital defendant's right to clear and accurate jury instructions and carefully guided jury deliberations.

Defendants will have no practical opportunity for rebuttal. In theory, defendants' rebuttal should be extremely broad because they have a right to present all relevant evidence that may have a mitigating effect. Mitigating evidence that besmirches the victim's personal, familial, and social worth should be deemed relevant by any court that deems victim-impact evidence relevant. Berger, *supra*, 20 *Fla.St.U.L.Rev.* at 50. Courts, however, might well limit the defendant's rebuttal evidence only to evidence that counters the very facts the State presents rather than evidence also showing the victim's uniqueness that may tangentially mitigate the sentence. *See, e.g., Goff v. State*, No. 71,404, 1996 *WL* 269199, at *16, ─── *S.W.*2d ───, ─── (Tex.Crim.App. May 22, 1996) (refusing defendant's rebuttal evidence of victim's homosexuality because considered not relevant despite ruling prosecutor's victim-impact evidence relevant under *Payne* ).

In any event, the opportunity for defendants to rebut victim-impact evidence is illusory. Presenting such rebuttal testimony risks creating a "mini-trial" that distracts the jurors from providing the defendant with individualized sentencing. In addition, defendants run the risk of offending the jurors. *Booth, supra,* 482 *U.S.* at 518 n. 3, 107 *S.Ct.* at 2541 n. 3, 96 *L.Ed.*2d at 458 n. 3 (White, J., dissenting). The task of rebutting victim-impact evidence is a practical and logical impossibility.

There is no escape from the conclusion that victim-impact evidence serves only to establish the "worthiness" of the victim and not the "blameworthiness" of the defendant. In practical effect, victim worth becomes an additional aggravating factor. The victim-impact statute will impermissibly compel defendants to forego their constitutional right to present catch-all mitigating evidence. If victim-impact evidence will affect a juror's consideration of other mitigating evidence, it will chill the defendant's constitutional right to present mitigating evidence. Moreover, the statute is so confusing that clear jury instructions will be impossi-

ble. These effects, alone or in combination, serve to deny capital defendants of their constitutional right to a fair trial and their right to a just and informed determination of deathworthiness.

## V

The victim-impact statute forces the jury to enter a maze with no exit. There are simply too many intricate and conflicting directions that a juror must follow. Death penalty sentencing requires jurors individually to identify whether mitigating factors exist. As a result, some jurors may not find that factor c(5)(h) exists although fellow jurors may find that it does. As a consequence, although the statute authorizes the State to present victim-impact evidence to all the jurors, the victim-impact evidence could then be considered by only some of the jurors.

Trial courts cannot possibly construct clear jury instructions for the victim-impact statute. The difficulty in formulating adequate limiting instructions increases the risk that jurors will disobey or be unable to follow them. Jury instructions must explain the purpose for which the evidence may be used and clearly delineate the process by which victim-impact evidence may be considered. Jurors must confine their use of the evidence not only to proper purposes (the uniqueness of the victim as a human being and the impact on survivors) but also condition their analysis of that evidence on an independent finding (whether mitigating factor c(5)(h) exists). Thus, the trial court must admonish the jurors not to use that evidence if they do not find the c(5)(h) factor. The court must instruct the jury not to consider that evidence in weighing any aggravating factor or in weighing the c(5)(h) factor insofar as it is based on evidence submitted pursuant to a mitigating factor other than c(5)(h). Nor can jurors use the evidence in weighing any mitigating factor other than c(5)(h).

In addition, jurors must be instructed that victim-impact evidence can be considered only in evaluating the weight to attach evidence submitted pursuant to c(5)(h) and that the victim-impact evidence cannot be considered after they finish discounting the

weight of the evidence submitted pursuant to c(5)(h). Jurors must be instructed that the victim-impact evidence cannot be used to demonstrate the survivors' thoughts on the defendant or on the proper punishment. The trial court must further admonish jurors not to use the evidence to compare the value of the defendant to the value of the victim, to determine the victim's value to any degree greater than any other person's value as a unique human being, or to consider the resulting loss to the community. Certainly, the jurors must not use the evidence to affix impermissible values to the victim based on age, race, ethnicity, gender, alienage, religion, patriotism, wealth, intelligence, literacy, occupation, sexual orientation, or physical disability.

Further, even if suitable instructions could be constructed, they would not work. Jurors would still use the victim-impact evidence improperly because the traditional methods of considering rebuttal evidence cannot be applied to this evidence. Traditionally, jurors either take rebuttal evidence as independent proof of a new fact or as evidence to be compared with the defendant's evidence to determine the value of the defendant's evidence. Jurors will, therefore, either take victim-impact evidence as proof of a new aggravating factor or create a contest of worth by comparing it with the defendant's character evidence. Both uses are unconstitutional.

The root of the problems is the highly prejudicial nature of victim-impact evidence. For example, in *State v. Erazo,* victim-impact evidence was presented about how the victim was a "religious" and "wonderful" woman. The jury sentenced the defendant to death. 126 *N.J.* 112, 160–66, 594 *A.*2d 232 (1991) (Handler, J., concurring and dissenting). At the subsequent penalty trial for resentencing following the reversal of the death sentence, the victim-impact evidence was excluded; the defendant was not sentenced to death. The prejudicial effect of victim-impact evidence cannot be minimized; it will be extremely difficult for jurors to escape its influence. The Court's simplistic answer to this

concern is to trust jurors to meet their responsibilities. *Ante* at 52, 678 *A.*2d at 173.

Courts have consistently expressed confidence in jurors to resolve important emotional issues in criminal and civil cases. Examples of judicial trust of juries include admitting other-crime evidence, prior-convictions evidence, and crime-scene or autopsy photographs. There are, however, areas in which the highly prejudicial nature of the evidence makes such blind trust unwise. *See, e.g., Bruton v. United States,* 391 *U.S.* 123, 131, 88 *S.Ct.* 1620, 1625, 20 *L.Ed.*2d 476, 482 (1968) (rejecting admission of codefendant's confession in joint trial when jury could not be trusted to disregard confession as it related to defendant; noting that "a jury cannot 'segregate evidence into separate intellectual boxes.'"); *Jackson v. Denno,* 378 *U.S.* 368, 84 *S.Ct.* 1774, 12 *L.Ed.*2d 908 (1964) (rejecting submission of factual issue of voluntariness of confession to jury when it could not be trusted to make preliminary factual finding of voluntariness as condition to considering veracity and weight of actual confession); *State v. Brunson,* 132 *N.J.* 377, 385–87, 625 *A.*2d 1085 (1993) (recognizing difficulty of preventing jurors from improperly considering similar prior criminal conviction only for impeachment, so limiting evidence to date and degree of offense).

The fundamental dilemma created by the statute is that victim-impact evidence will be presented to *all* jurors. Yet all jurors will be asked to disregard that evidence in some way: jurors who do not find factor c(5)(h) must disregard it for all purposes while jurors who find factor c(5)(h) must disregard it for all purposes except to determine the weight of evidence submitted pursuant to c(5)(h). As the trial court recognized, victim-impact evidence is so inflammatory that it is impractical to ask jurors to ignore that evidence. The trial court said that any expectations that jurors could ignore such evidence "unrealistically ignores human nature." *State v. Muhammad,* No. 2285-6-95, at 4 (Law Div. Nov. 17, 1995). It stated that "[t]o avoid being overwhelmed by the weeping and bitter family members of a homicide victim and the

highly charged comments thereon by the prosecutor would test the limits of conscience [of] even the most experienced and hardened judge. There is no gainsaying the emotive power of such evidence upon the jurors." *Id.* at 7.

The majority treats those concerns dismissively by relying on jurors' presumed ability to follow limiting instructions. It also suggests that Justice O'Connor's concurrence in *Payne* supports the view that the danger that jurors will misuse victim-impact evidence does not justify barring it. *Ante* at 52–53, 678 *A.*2d at 178–179. Justice O'Connor, however, refers not to the danger of juror misuse or juror confusion but only considers "[t]he possibility that this evidence may in some cases be unduly inflammatory." *Payne*, 501 *U.S.* at 831, 111 *S.Ct.* at 2612, 115 *L.Ed.*2d at 720.

In his separate opinion, Justice O'Hern believes these intractable problems can be avoided simply by permitting victim-impact evidence in every capital prosecution. *Ante* at 65, 678 *A.*2d at 185. Justice O'Hern bases his suggestion on the Court's observation in *Williams II*, *supra*, that capital trials "will necessarily involve testimony and physical evidence pertaining to the victim." *Ibid.* However, the Court in *Williams II* limited its discussion to evidence that was admissible because it was "probative of critical aspects of the trial, *e.g.*, defendant's assertion of self-defense or provocation." 113 *N.J.* at 451, 550 *A.*2d 1172; *see* discussion, *supra* at 44, 678 *A.*2d at 175. Clearly, the Court was not suggesting that victim-impact evidence should be allowed in every capital prosecution.

As discussed earlier, victim-impact evidence has no relevance if considered to rebut evidence submitted pursuant to c(5)(h). *See* discussion, *supra* at 48–50, 678 *A.*2d at 177–178. Victim-impact evidence may not be used in direct rebuttal but only to weigh evidence submitted pursuant to c(5)(h). Put another way, evidence directly rebutting the existence of a mitigating factor is relevant *before* the juror concludes whether the mitigating factor exists; in fact, it is relevant because it will be considered *while* the

juror determines whether the mitigating factor exists. However, victim-impact evidence under the victim-impact statute is not relevant until *after* the juror concludes that mitigating factor c(5)(h) exists; in fact, the jury may not consider victim-impact evidence *unless* "the jury finds the existence of a mitigating factor pursuant to [c(5)(h)]." *N.J.S.A.* 2C:11–3c(6). Once a capital defendant introduces evidence of a mitigating factor, evidence directly rebutting it has immediate probative value and every juror should consider it. *See, e.g., State v. Rose,* 112 *N.J.* 454, 501–05, 548 *A.2d* 1058 (1988) (determining that evidence of defendant's misconduct could rebut mitigating evidence of good character). In sharp contrast, the victim-impact evidence will have no probative value for jurors not finding the c(5)(h) factor. Those jurors would not consider victim-impact evidence at any time, either when rejecting the c(5)(h) factor or when weighing the aggravating and mitigating factors they found. The fallacy of the statute is that victim-impact evidence is, nevertheless, presented to those jurors. As Justice O'Hern aptly points out, "[t]here is little chance that members of a jury that hear evidence about who was murdered and the effect of the murder on the victim's family will be able to put that evidence out of their minds merely because they do not find the catch-all mitigating factor." *Ante* at 63–64, 678 *A.2d* at 184–185 (O'Hern, J., concurring and dissenting). I agree, then, with Justice Stein's observation that the statute requires a jury instruction that "[n]o court could expect jury members to obey." *Post* at 109, 678 *A.2d* at 207 (Stein, J., dissenting).

In addition, the majority acknowledges a necessary gatekeeping function of the trial court under *N.J.R.E.* 403. *Ante* at 55, 678 *A.2d* at 180. Although the majority notes that the danger of prejudice should be examined in making the *N.J.R.E.* 403 determination, the majority contradicts the *N.J.R.E.* 403 standard by declaring that "there is a strong presumption that victim-impact evidence that demonstrates that the victim was a unique human being is admissible." *Ante* at 55, 678 *A.2d* at 180. There is no

reason to deviate from the evidentiary standard of *N.J.R.E.* 403 by creating a strong presumption of admissibility.

Finally, such *N.J.R.E.* 403 determinations will escape judicial review because judicial review will be an intellectual impossibility. There is simply no way that the discretionary decision of the trial court to admit victim-impact evidence can be evaluated. In determining the probative value of victim-impact evidence for *N.J.R.E.* 403 purposes, trial courts must assess the chance that jurors will find that the c(5)(h) factor exists. That determination can be nothing but speculative. It consequently cannot be tested on review.

## VI

The use of victim-impact evidence portends the loss of another constitutional or fundamental right: proportionality review. The addition of victim-impact evidence to the mix of factors weighing in on a jury's decision to sentence a defendant to death presages the loss from the proportionality review database of all previous cases where such evidence was not included and where its inclusion may have affected the jury's decision. In addition, the inclusion of this new factor unimaginably increases the subjectivity of proportionality review and will render such review standardless.

The purpose of comparative proportionality review is "to ensure that the death penalty is being administered in a rational, non-arbitrary, and evenhanded manner, fairly and with reasonable consistency." *Marshall II, supra,* 130 *N.J.* at 131, 613 *A.*2d 1059. Comparative proportionality review is both offender-oriented and offense-oriented. *Id.* at 126–27, 613 *A.*2d 1059. One component of proportionality review involves precedent-seeking review, under which the Court undertakes a "more traditional case-by-case comparison of similar death-eligible cases." *State v. Bey,* 137 *N.J.* 334, 366, 645 *A.*2d 685 (1994) (*Bey IV*). The case-by-case comparison requires the Court to identify "all relevant aggravating and mitigating factors, both statutory and non-statutory, that are 'rooted in traditional sentencing guidelines.'" *Martini II, supra,*

139 *N.J.* at 48, 651 *A.*2d 949 (quoting *Marshall II, supra,* 130 *N.J.* at 159, 613 *A.*2d 1059).

One criterion used in that analysis of criminal culpability involves the defendant's moral blameworthiness. The elements of blameworthiness used in proportionality review do not involve victim-impact evidence in the sense contemplated by the statute. Rather, this criterion includes factors such as motive or premeditation. To the extent blameworthiness involves harm to the victim or the victim's survivors, the evidence must relate to the defendant's intent. This form of blameworthiness may be affected by the defendant's *"knowledge of the helplessness of the victim* [and] *knowledge of the murder's effects on any non-decedent victims."* *Martini* II, *supra,* 139 *N.J.* at 49, 651 *A.*2d 949 (emphases added). Although the "degree of victimization" is also an element of criminal culpability, it relates to the extent of mutilation, the infliction of suffering on non-decedent victims, and in general the brutality of the murder. *Id.* at 49, 651 *A.*2d 949; *DiFrisco II, supra,* 142 *N.J.* at 242–43, 662 *A.*2d 442 (Handler, J., dissenting). Victimization does not include the unanticipated and unspecified harm that might be disclosed through victim-impact evidence. *DiFrisco II, supra,* 142 *N.J.* at 239–40, 662 *A.*2d 442 (Handler, J., dissenting); *Bey IV, supra,* 137 *N.J.* at 366, 645 *A.*2d 685.

The Court has expressed a preference for the "salient-factors test" of proportionality review that compares factually similar cases. *DiFrisco II, supra,* 142 *N.J.* at 232–33, 662 *A.*2d 442 (Handler, J., dissenting). The application of that test will be rendered unworkable and useless by the admission of victim-impact evidence, which may obscure the jury's consideration of mitigating factors and actually constitute a silent aggravating factor that has significant influence on the death-sentence decision.

There is no question that victim-impact evidence will compound the contradictions that now impair proportionality review. *N.J.S.A.* 2C:11–3c(6) authorizes two forms of victim-impact evidence; the first relates to the victim's character and background.

Proportionality review will require tracking information in such categories as socio-economic status (type of job, education, assets) and community status (community activities, church affiliation, reputation, lack of criminal record, family status). This process will not be easy because detailed victim information, other than occupation, is often unavailable. This process, however, is critical because such evidence, specifically socio-economic status, significantly influences juries during capital sentencing. *See* Letter from David Weisburd to John McCarthy (Dec. 20, 1995) (found in Technical App. 11 to *State v. Harris*, A–108–95, to be argued Sept. 10, 1996).

The other aspect of victim-impact evidence relates to survivors. We have not previously captured data on the impact of the murder on victims' survivors. We often know little about them. That type of evidence will be extremely difficult to quantify and measure. It requires somehow measuring the emotional and financial effect of the murder on survivors. Those effects will be subjective and complex. Moreover, if this evidence is presented by survivors' testimony, the survivors' skills in conveying their emotions to the jury must be quantified to provide objective comparison with other cases.

Given the above, capital cases tried before the advent of the victim-impact statute where the death-eligible defendant was sentenced to life imprisonment will have no precedential value in a comparison with post-statute death sentences. These cases will then be excluded from the proportionality review database, but the exclusion of the life-sentenced cases from the database will skew the database in favor of death-sentenced cases adding a death-bias to all future proportionality reviews. Pre-statute cases will have no value because the jury that decided on a life sentence did not hear victim-impact evidence. Had the jurors heard such evidence, especially if the evidence showed that the victim had close sympathetic survivors—that is, immediate household family with loving emotional and financial ties—the jurors might well have voted for a death sentence. Because those cases are unreliable in a post-

statute review, the cases would have to be excluded or severely limited in their precedential value. However, pre-statute cases where the jurors voted for death would not have to be excluded because we know that victim-impact evidence would not have infected and affected the verdict. Thus, pre–1996 life cases, but not death cases, would be excluded. Any future proportionality review would then have as a database only those cases where the defendant was sentenced to death. Such a database would make any future death sentence appear proportional. The inference is inescapable that the victim-impact statute will destroy effective proportionality review.

Consistency is essential in the administration of capital punishment. This principle is founded on this State's constitutional commitment to prevent the infliction of cruel and unusual punishments, and to ensure due process and equal protection of the laws. *N.J. Const.*, art. I, ¶¶ 1, 5, 12. "Any failure to assure evenhandedness and consistency in the sentencing of all capital defendants and any failure to assure comparative proportionality of individual death sentences violates those constitutional principles, and, indeed, fails to honor the constitutional values placed on individual dignity and human life." *Marshall II, supra,* 130 *N.J.* at 235, 613 *A.*2d 1059 (Handler, J., dissenting).

Proportionality review bears a great part of the responsibility for assuring consistency and evenhandedness in the administration of capital punishment. It operates " 'as a check against the random and arbitrary imposition of the death penalty' by an aberrant jury." *Ramseur, supra,* 106 *N.J.* at 327, 524 *A.*2d 188 (quoting *Gregg v. Georgia, supra,* 428 *U.S.* at 206, 96 *S.Ct.* at 2940, 49 *L.Ed.*2d at 893). Beyond the prevention of arbitrariness, proportionality review also "is a means through which to monitor the imposition of death sentences and thereby to prevent any impermissible discrimination in imposing the death penalty" on such bases as race, sex, or other suspect classification. *DiFrisco II, supra,* 142 *N.J.* at 245, 662 *A.*2d 442 (Handler, J., dissenting) (quoting *Ramseur, supra,* 106 *N.J.* at 327, 524 *A.*2d 188). Victim-

impact evidence will further undermine proportionality review and the judiciary's capacity to preside over capital punishment prosecutions with any semblance of fairness and equality.

## VII

The introduction of victim-impact evidence unacceptably exacerbates the racial disparities evident in capital sentencing. Victim-impact evidence encourages jurors to examine and use, both consciously and unconsciously, the comparative worth of the defendant and the victim. Race unquestionably influences our perceptions. This evidence will therefore set back our attempts to eliminate racial disparities in capital sentencing. Such discriminatory sentencing cannot be tolerated in New Jersey. "[W]hen an institution of justice fosters either overt or hidden use of constitutionally forbidden criteria such as race, social standing, religion, or sexual orientation, it cannot be defended as just." Berger, *supra*, 20 *Fla.St.U.L.Rev.* at 48. Victim-impact evidence will be the Trojan horse that will bring into every capital prosecution a particularly virulent and volatile form of discrimination.

The most lethal part of racial bias that may be exacerbated by victim-impact evidence is discrimination based on the victim's race. American history is replete with examples of punishment that was explicitly related to the race of the victim.[1] Statistical analysis of capital sentencing suggests a bias based on the victim's race. In *McCleskey v. Kemp*, 481 *U.S.* 279, 107 *S.Ct.* 1756, 95 *L.Ed.*2d 262 (1987), the United States Supreme Court considered the Baldus study, which concluded that in Georgia capital defendants charged with killing whites were 4.3 times more likely to be sentenced to

---

[1] For example, a Georgia law provided that a black man's rape of a free white female "shall be" punishable by death but a black man's rape of a black female was punishable "by fine and imprisonment, at the discretion of the court." A. Leon Higginbotham, Jr., *In the Matter of Color: Race in the American Legal Process* 256 (1978) (citing Ga. Penal Code (1861)). Other laws also discriminated on the basis of the defendant's race. For example, a white man's rape of a white female was punishable by imprisonment for two to twenty years. *Ibid.*

death than those charged with killing blacks. *Id.* at 287, 107 *S.Ct.* at 1764, 95 *L.Ed.2d* at 275. Although roughly half the total homicide victims are black,[2] only 40 of the first 318 executions that have taken place since *Gregg* involved black victims.[3] A General Accounting Office report surveying twenty-eight statistical studies on post-*Furman* capital sentencing found that twenty-three of the studies determined that the victim's race influenced the likelihood that the defendant would be charged or sentenced with a capital crime. General Accounting Office, Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities, Cong. Record S–6889 (May 24, 1990).

I continue to hold grave concerns about racial discrimination in capital sentencing. *See Jackson, supra,* 128 *N.J.* at 151, 607 *A.2d* 974 (Handler, J., dissenting) (criticizing refusal in *McCleskey v. Kemp* to vacate death sentence despite assuming racial disparities exist; "Our Court, committed as it is to the eradication of unfair discrimination in the criminal justice system, should not be so unresponsive.").

The Baldus study's concerns have not abated. Baldus, *Death Penalty Proportionality Review Project Final Report to the New Jersey Supreme Court* (Sept. 24, 1991). Commentators believe that the main reason for continuing discrimination is that "racial prejudice is a powerful force that may not be easily extirpated by statutory or verbal formulas." Welsh S. White, *The Death Penalty in the Nineties* 136–37 (U. Michigan Press 1991); *see* Randall Kennedy, McCleskey v. Kemp: *Race, Capital Punishment, and the Supreme Court,* 101 *Harv. L.Rev.* 1388, 1394 (1988) (noting that jury's disparate reaction suggests that black communities are

---

[2] U.S. Department of Justice, *Sourcebook of Criminal Justice Statistics* 390, table 3.131 (1989).

[3] NAACP Legal Defense Fund, *Death Row U.S.A.* at 4–10 (Jan. 31, 1996). In two of the 40 cases, there was also a white victim. Only 58 of the 318 executions involved non-white victims, of which four also involved a white victim.

being "slighted by criminal justice systems that respond more forcefully to the killing of whites than the killing of blacks").

Charges of racial bias within our own capital-sentencing system are not new. The Special Master's Report, noted in *Marshall II*, suggested that a discrepancy in capital-sentencing rates may correlate to the race of the defendant or the race of the victim. 130 *N.J.* at 207, 613 *A.*2d 1059. Other bases for unprincipled discrimination against the value of certain classes of victims exist. "For instance, religious and political dissidents, gay people, homeless drifters, prostitutes, and drug addicts may not be regarded as true victims, or their assailants as real criminals, by judges and jurors from (typically) white and middle-class backgrounds." Berger, *supra*, 20 *Fla.St.U.L.Rev.* at 52. A recent study draws preliminary conclusions focusing on three areas for potential bias: cases involving black defendants, white victims, or high-status victims. The study believed that there was bias in capital sentencing and that the high status of the victim and the race of the defendant had a significant impact on the life-or-death decision. Letter from David Weisburd to John McCarthy, *supra*.

Victim-impact evidence will clearly feed such unconscious biases and increase the level of discrimination because it magnifies the likelihood that jurors will impose punishment if the victim is of an impermissibly favored race or class.[4] The most potent victim-

---

[4] Unexpressed biases are often so strongly held that they come to the surface: for example, one Texas judge imposed a lenient term for the murderer of two homosexuals and stated that "I put prostitutes and gays at about the same level ... and I'd be hard put to give somebody life for killing a prostitute." Lisa Belkin, "Texas Judge Eases Sentence for Killer of Two Homosexuals," *N.Y. Times*, Dec. 17, 1988, at 8.

There is much commentary about the pervasive devaluation of victims of color in potentially capital proceedings. . One news reporter wrote that for the Chattahoochee Circuit in Georgia, "By both prosecuting their killers more vigorously and tending more assiduously to their bereaved survivors ... the system places a premium on white lives over black." David Margolick, "In Land of Death Penalty, Accusations of Racial Bias," *N.Y. Times*, July 10, 1991, at A1.

impact evidence is likely to underscore those factors. Such biases in capital sentencing run afoul of the State Constitution.

Examining the victim-impact statute provides some context for the general discussion of racial discrimination. By statute, victim-impact evidence may be used to consider the impact of the murder on the victim's survivors. Jurors will utilize their unconscious impressions of the victim's worth when considering whether the credibility of the victim-impact evidence and the degree to which the survivors' suffering will counter the weight of the c(5)(h) evidence. First, jurors will consider whether the victim-impact evidence correlates to what the jurors believe is the appropriate impact for the victim's death. Second, jurors will make a moral determination of the gravity of the victim's death. Such steps accentuate disparate capital sentencing on the basis of the victim's race. For these reasons, victim-impact evidence raises the foreboding possibility that death-penalty sentencing decisions influenced by victim-impact evidence will be based on the "same invidious motives" as race-based discrimination. *Payne, supra,* 501 *U.S.* at 866, 111 *S.Ct.* at 2631, 115 *L.Ed.*2d at 763 (Stevens, J., dissenting).

## VIII

The Court's most recent decisions involving death penalty cases only add to the sorry saga that has become the jurisprudence of capital punishment. Each case, in its own way, demonstrates and underscores the inherent and inescapable contradictions within that jurisprudence. The Court struggles to reconcile the irreconcilable. It only creates more profound confusion and intractable contradictions.

This decisional process comes with monumental sacrifice; it involves enormous resources, time, and energy. Were this an academic debate, the futility of the pursuit would not be so prohibitive. If this complicated only the discourse of scholars, we might allow ourselves to be fascinated by the intellectual exercise. However, human lives rest in the balance of the Court's judgments

and words. No error can be passed off as innocuous. This case unfortunately epitomizes the deepest level of the capital punishment dilemma. The prejudice arising from victim-impact evidence goes to the very base of the structure of our carefully, constitutionally contrived system of capital punishment. It effectively destroys that base.

For the reasons stated, I dissent from the Court's opinion.

STEIN, J., dissenting.

The dilemma presented by this appeal is obvious. The Legislature perceives an imbalance in the trial of capital cases because juries in the penalty phase often hear mitigating evidence from a defendant's family about his disadvantaged background, without hearing any evidence about the identity of the victim and the impact of the homicide on the victim's family. To correct that imbalance, the Legislature has authorized the State to introduce victim impact evidence to offset the weight that those jurors in a capital case who find the c(5)(h) mitigating factor accord to that mitigating evidence. The Court's primary concern is that the admissibility of such evidence does not subject death-penalty juries to emotional and inflammatory testimony that will result in death-sentencing decisions based primarily on the force of the victim impact evidence.

Although well-intended, the statute creates more problems than it solves, and poses a fundamental threat to the rationality of death-penalty prosecutions in New Jersey. Justice Handler addresses many of the practical problems posed by the statute, *ante* at 191–194, 678 A.2d at 199–205, and concludes that the statute violates state constitutional principles. *Ante* at 77–82, 678 A.2d at 93–105. The Chief Justice, although concluding that the statute is unwise but not unconstitutional, believes that its application will inject arbitrariness into the prosecution of capital cases. Justices O'Hern and I believe the statute may violate the federal constitutional guarantee that a defendant be allowed to introduce relevant mitigating evidence in his own behalf. We would invalidate the

statute, but would allow limited use of victim impact evidence in all capital prosecutions, differing somewhat on the permitted use of such evidence.

The majority sustains the statute without addressing or resolving many of the problems it poses, but appropriately attempts to limit the potentially distorting effects of victim impact evidence by authorizing trial courts to impose restrictions on the emotional and substantive context of such testimony in order that juries will not be misled by its admission. *Ante* at 54, 678 *A.*2d at 180.

For over ten years this Court has attempted to infuse rationality and coherence into capital murder prosecutions, steadfastly refusing to sustain death sentences that did not satisfy our standards of constitutionality and trial fairness. In my view, this statute will grossly distort the reliability of capital prosecutions, prevent defendants from asserting their constitutional right to present mitigating evidence, and leave juries seriously confused over their function. It will also raise a cloud over the constitutionality of death sentences imposed in this State. Moreover, no statute is necessary to permit the limited introduction of victim impact evidence in death penalty cases. For those reasons, I cannot join the majority opinion.

I

The majority opinion will leave unsettled for many years the constitutionality of any future death sentence, in this case or any other case, imposed under New Jersey's capital punishment act, *N.J.S.A.* 2C:11–3c. Although the United States Supreme Court held in *Payne v. Tennessee*, 501 *U.S.* 808, 825, 111 *S.Ct.* 2597, 2608, 115 *L.Ed.*2d 720, 735 (1991), that the Eighth Amendment does not prohibit states from admitting victim impact evidence in death penalty prosecutions, that Court has never held, much less considered, whether a State can admit that victim impact evidence to rebut evidence of only *one* of the several authorized statutory mitigating factors.

As Justice O'Hern's separate opinion implies, *N.J.S.A.* 2C:11–3c(6) impermissibly burdens the constitutional right of a defendant to offer mitigating evidence under the c(5)(h) catch-all mitigating factor. In *Lockett v. Ohio*, 438 *U.S.* 586, 98 *S.Ct.* 2954, 57 *L.Ed.*2d 973 (1978), the Supreme Court invalidated an Ohio capital-punishment statute that recognized only three mitigating factors and precluded consideration by the sentencing judge of a defendant's age, character, prior record, lack of specific intent, and relatively minor role in the homicide. The Court held that under the Eighth and Fourteenth Amendments a sentencer in a capital case may "not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604, 98 *S.Ct.* at 2964–65, 57 *L.Ed.*2d at 990.

Although the victim impact statute does not preclude a defendant from offering evidence to support the c(5)(h) factor, the statute burdens the exercise of that right by allowing the State to rebut only that mitigating evidence with victim impact proof. As Justice O'Hern demonstrates, the inevitable effect of that "restriction" on the use of the c(5)(h) factor will be to compel defense counsel to avoid that factor and attempt "to shoehorn the mitigating evidence * * * into one of the other mitigating factors, most likely factors c(5)(a), c(5)(d), c(5)(e)." *Ante* at 64, 678 *A.*2d at 184. Accordingly, the statute poses a substantial risk of violating the core principle of *Lockett* because it so greatly burdens the use of the c(5)(h) factor alone—and no other—by subjecting it to the powerful offsetting effect of victim impact evidence. Any defense counsel would be deficient if he or she did not try to avoid using the c(5)(h) factor by attempting to offer substantially the same evidence through other mitigating factors.

Thus, it is a virtual certainty that any defendant sentenced to death after this opinion will raise an Eighth and Fourteenth Amendment challenge, alleging that the restriction on the right to offer mitigating evidence imposed by the victim impact statute is

unconstitutional. Defendants who offer c(5)(h) evidence will argue that their right to do so was impermissibly burdened by the victim impact evidence offered in rebuttal, and defendants who avoid the use of c(5)(h) evidence will argue that their presentation of mitigating evidence was unconstitutionally restricted by the need to eschew use of the c(5)(h) factor in order to avoid the effect of victim impact evidence.

At the heart of the Supreme Court's holding in *Payne* was its observation that "there is nothing unfair about allowing the jury to bear in mind [the harm that Payne's killing had caused] at the same time as it considers the mitigating evidence introduced by the defendant." 501 *U.S.* at 826, 111 *S.Ct.* at 2609, 115 *L.Ed.*2d at 736. Not one line of that opinion suggests that the State can single out evidence of one mitigating factor and authorize the use of victim impact evidence solely to rebut that mitigating evidence. In my view, the constitutional question presented by the victim impact statute is substantial and unresolved, and the constitutionality of death sentences imposed in New Jersey for years to come will hang in the balance, while the constitutionality of the statute is litigated through the federal appellate process.

The other irremediable flaw in the statute, as noted by Justice O'Hern, *ante* at 63–64, 678 *A.*2d at 184–185, and Justice Handler, *ante* at 95–95, 678 *A.*2d at 200–201, is the absurd and surely to be ignored jury instruction that it requires. Because only jurors who find the c(5)(h) mitigating factor can consider the victim impact evidence, the trial court must instruct the jury that those members who do not find the c(5)(h) factor must disregard the victim impact evidence. No court could expect jury members to obey that instruction, but the majority sustains the statute nevertheless. The Court should not uphold a statute that requires a jury instruction with which no jury could conceivably comply.

Moreover, the statute authorizes the admissibility of the victim impact evidence solely in response to the defendant's presentation of evidence pursuant to the c(5)(h) factor, and before the jurors determine whether any of them find the existence of that mitigat-

ing factor. Thus, the possibility exists that the victim impact evidence will be admitted but ultimately will be irrelevant because no juror finds the c(5)(h) factor to exist. The court would then be obligated to instruct the entire jury to disregard the victim impact evidence, an instruction virtually impossible to obey.

## II.

With but one qualification, I am persuaded that Justice O'Hern's proposed procedure, which requires no statute, is far preferable to that endorsed by the majority. I would invalidate *N.J.S.A.* 2C:11–3c(6) under the federal Constitution, as an impermissible burden on a defendant's right to present mitigating evidence. I would hold that limited victim impact evidence is admissible in every capital case to inform the jury of the victim's identity and unique characteristics and generally to inform the jury of the impact of the homicide on the victim's family.

As Justice O'Hern observes, our death penalty jurisprudence has excluded evidence and argument focused on the victim only when its obvious purpose was to inflame the jury, and evidence informing the jury about the victim in some detail has been routinely admitted when relevant to the State's guilt-phase proofs. *Ante* at 61–62, 678 *A.*2d at 183–184. In *State v. Williams,* 113 *N.J.* 393, 550 *A.*2d 1172 (1988), we held that evidence pertaining to the victim, although admissible, "cannot be used in a manner calculated to so confuse or impassion the jury that it inappropriately intertwines irrelevant emotional considerations with relevant evidence." *Id.* at 451, 550 *A.*2d 1172. Because the constitutionality of non-inflammatory victim impact evidence has been resolved by the United States Supreme Court, I would hold that such evidence is admissible in the penalty phase of all capital cases without statutory authorization. The jury should be permitted to evaluate that evidence in determining the weight to be accorded to all mitigating evidence offered by a defendant. The critical task is to control the emotional context of that evidence.

To counterbalance the obvious emotional effect of such evidence, I would require the jury to be instructed that it is not to attempt any comparison between the value of the victim's life and the defendant's life, and that our jurisprudence does not permit the imposition of the death penalty to be predicated on the relative worth of victims. Regrettably, in considering such evidence as bearing on the weight to be accorded a defendant's mitigating evidence, the jury will be comparing unrelated evidence, although in a manner not dissimilar from the jury's function in weighing aggravating against mitigating factors. Accordingly, I would also require a jury instruction along the following lines:

I have previously instructed you that in order for you to sentence the defendant to death you must find that the State has proved that the aggravating factors that you have determined to exist in this case substantially outweigh the mitigating factors that you have determined to exist in this case, beyond a reasonable doubt. I note that when you engage in that weighing process you will be comparing aggravating factors and mitigating factors that are not directly relevant to each other. For example, the aggravating factor that the homicide was committed in the course of a felony does not readily relate to the mitigating factor based on defendant's age. Nevertheless, the law requires that you weigh those factors against each other. In doing so, the law in effect requires that you determine the relative significance of the aggravating and mitigating factors as they apply to your determination about the appropriateness of the ultimate penalty to be imposed on defendant.

With respect to the victim impact statements that have been offered into evidence, your function is a similar one. The purpose of those statements is to show you the victim's unique status as a human being and the nature of the harm caused by the defendant's criminal conduct. Just as you should know the unique human being that is the defendant, you should know the unique human being that was the victim of his crime. The status of the victim is not in any sense to be considered by you as an aggravating factor under the Death Penalty Act. Each murder victim is equally worthy in the eyes of the law and you are not to infer that such evidence signified that defendants whose victims were assets to the community are more deserving of death than defendants whose victims are perceived to be less worthy.

Nevertheless, I instruct you that you are permitted to evaluate the evidence concerning the victim's unique status as a human being and the harm caused by the defendant's conduct in deciding how much weight you will attribute to the mitigating factors that you find. Of course, in making that evaluation, you must not attempt to compare the value of the victim's life with the value of the defendant's life. You must simply consider the victim impact evidence and then determine whether or to what extent it does or does not affect the weight that you will assign to the mitigating factors that you determine defendant has proved to exist.

## III

The grave constitutional issue posed by the statute and the incomprehensible jury instruction required by it, argues compellingly against the result reached by the majority. It may be contended that the alternatives proposed by Justice O'Hern and by this opinion would result in more victim impact evidence than is authorized by the statute. Perhaps so, but that evidence would be presented more coherently, without subverting and burdening the constitutional rights of defendants and without requiring jury instructions that no jury could honor. The Court can accommodate the legislative will without distorting and undermining the reliability of all death penalty prosecutions. By sustaining the statutory scheme, the Court explicitly enforces the legislative mandate, but in the process subjects capital prosecutions to an incoherent procedure with serious constitutional vulnerability.

*For affirmance*—Chief Justice WILENTZ, and Justices POLLOCK, GARIBALDI and COLEMAN—4.

*Concurring in part; dissenting in part*—Justice O'HERN—1.

*Dissenting*—Justices HANDLER and STEIN—2.